2023 IL App (1st) 220035

SIXTH DIVISION
June 30, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-0035

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 17983 |
| | ) | |
| PHAROAH MORRIS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1    This case is now before us for a second time on direct appeal with regard to Pharoah Morris's sentence. A jury found Pharoah guilty of murder and attempted murder—offenses committed when he was just 16 years old—and he was sentenced to a total of 100 years in prison. Pharoah's original sentencing hearing occurred after the United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460, 465 (2012), that mandatory life sentences without parole for juvenile offenders violate the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) but before our own supreme court extended that holding, in *People v. Reyes*, 2016 IL 119271, ¶ 9, to lengthy term-of-years sentences that are *de facto* life sentences. Although the

trial court commented on Pharoah's youth and upbringing at sentencing, we concluded on his first direct appeal that those observations were not the same as a full consideration of the special characteristics of youth identified by the Court in *Miller*. *People v. Morris*, 2017 IL App (1st) 141117, ¶¶ 26, 32. We vacated Pharoah's sentence and remanded his case to the trial court for resentencing. *Id.* ¶ 33.

¶ 2     A new statutory sentencing scheme applied on remand. Under section 5-4.5-105 of the Unified Code of Corrections (Code), courts are now required to consider the youth-based sentencing factors set out in *Miller* whenever an individual under the age of 18 is sentenced, and firearm enhancements are discretionary, rather than mandatory, for such individuals. 730 ILCS 5/5-4.5-105 (West 2020). Pursuant to section 5-4.5-115(b) of the Code, individuals who were under the age of 21 at the time of their offenses are also now eligible for parole before serving their full sentences. *Id.* § 5-4.5-115(b). Following additional briefing, the filing of an updated presentence investigation (PSI) report, and a new sentencing hearing, the trial court imposed the same 100-year sentence that it had before. Pharoah again appealed.

¶ 3     The parties initially focused their briefing on whether the constitutional protections afforded by *Miller* and its progeny are still implicated when, as here, a juvenile offender will have the opportunity to petition for parole within 40 years of being incarcerated. In addition, during the pendency of this appeal, the Illinois Supreme Court issued its opinion in *People v. Wilson*, 2023 IL 12766, ¶¶ 29, 41-42, overruling its holding in *People v. Holman*, 2017 IL 120655, ¶ 40, that *Miller* applied to discretionary, as well as mandatory, life sentences. The parties filed motions, after briefing was completed but before argument, addressing the impact of *Wilson* on Pharoah's constitutional claims.

¶ 4     We need not and will not reach these constitutional questions, however, where there is a

nonconstitutional basis for vacating Pharoah's sentence. The record here reflects that the sentencing judge was predisposed on remand to impose the same 100-year sentence he had given Pharoah initially. The judge therefore failed to give fair consideration to the statutory youth-based sentencing factors or to the full range of sentences now available under the new sentencing scheme for defendants who committed crimes as juveniles. Accordingly, we vacate Pharoah's sentence and remand for resentencing.

¶ 5                                        I. BACKGROUND

¶ 6                               A. Trial and Initial Sentencing

¶ 7        Pharoah was charged with the first degree murder of DeAntonio Goss and the attempted murder and aggravated battery with a firearm of Corey Thompson. We summarized the evidence presented at trial in some detail in our prior decision on direct appeal. *Morris*, 2017 IL App (1st) 141117, ¶¶ 3-14. We revisit it again here only briefly.

¶ 8        Corey Thompson testified that on September 8, 2010, he was walking home from Bowen High School with a group of friends, including DeAntonio Goss, when they came upon Pharoah and his friend Lacy Sheppard. Pharoah pulled a gun on them, saying, "[t]his is what y'all want, this is what y'all going to get." Seeing the gun, Corey and DeAntonio ran in different directions. Corey felt something hit him in his buttocks. He fell down but picked himself up and began running again. When he could no longer keep going, he lay down in the street. He heard DeAntonio looking for him, saying, "CJ, where are you, where are you, are you okay?" Corey then saw Pharoah heading in the direction of DeAntonio's voice and heard a few more gunshots before he lost consciousness. Corey was in the hospital for three weeks and underwent two surgeries as a result of his injuries.

¶ 9        Two of the students walking with Corey and DeAntonio also witnessed the shooting and

identified Pharoah from in-person lineups.

¶ 10     To show identity and the absence of mistake, the State was allowed to present evidence of another shooting that took place two weeks before the one at issue in this case. Marvin Floyd testified that on the afternoon of August 23, 2010, he rode his bike to a gas station near his home and saw Pharoah there, with what appeared to be a gun under his pants. Marvin fled on his bike but was shot in the back. He spent two months in the hospital and also underwent two surgeries.

¶ 11     A bullet recovered from Marvin's body matched a bullet recovered from DeAntonio's body, and it was determined that the bullets were fired from the same gun.

¶ 12     The State also introduced evidence that Pharoah had taken steps while incarcerated to prevent the State from calling its witnesses at trial. Ricky Whitehead, Pharoah's cellmate at the Cook County jail, testified that Pharoah gave him a list of the State's witnesses, including Corey Thompson, and asked if Mr. Whitehead could have those individuals "tooken care of." Mr. Whitehead understood this to mean that Pharoah wanted the witnesses killed. He showed the list to a prison official before returning it to Pharoah.

¶ 13     Eric Bucio, an instructor at the jail complex, testified that he was assigned to investigate the matter and found the list among the personal items Pharoah kept in his jail cell.

¶ 14     The State rested, the defense presented no evidence, and after deliberating, the jury found Pharoah guilty on all counts.

¶ 15     The PSI report revealed the following. Pharoah's father was incarcerated in another state. Pharoah had begun drinking alcohol at age 9 and using marijuana at age 11. By the age of 13, he was drinking multiple glasses of hard liquor per day. Pharoah had started seeing a psychiatrist at age 12 for anger management. He was diagnosed and prescribed medication for bipolar disorder. And he had reported attempting suicide multiple times.

¶ 16    Following a hearing, the trial court initially sentenced Pharoah to an aggregate term of 100 years in prison (consecutive terms of 30 years for first degree murder and 25 years for attempted first degree murder, plus what were then mandatory firearm enhancements of 25 years and 20 years, respectively, on those two charges, with the battery charge merging into the attempted murder charge). The court concluded that Pharoah had a "malignant heart," observed that there was "[n]ot much" to consider in mitigation besides the fact that he was 16 years old at the time of his offenses, and was satisfied that Pharoah had "earned every single day, every single minute, [and] every single second" of his sentence. "Is there room for rehabilitation for Pharoah Morris?" the court asked. "That's up to him. If he's rehabilitated he'll be inside, however."

¶ 17                              B. Initial Direct Appeal

¶ 18    In his initial direct appeal, Pharoah argued, among other things, that his 100-year sentence was a mandatory *de facto* life sentence. He maintained that the statutory sentencing scheme then in place, which required the trial court to sentence him to consecutive prison terms with corresponding mandatory 25-year and 20-year firearm enhancements, precluded the sentencing judge from considering his youthful characteristics and thus violated both the eighth amendment and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). *Morris*, 2017 IL App (1st) 141117, ¶ 19. This court agreed. We noted that, while Pharoah's appeal was pending, our supreme court had extended the holding in *Miller*, 567 U.S. at 465, to *de facto* life sentences (*Morris*, 2017 IL App (1st) 141117, ¶ 23 (citing *Reyes*, 2016 IL 119271, ¶ 9)). We concluded that Pharoah, who would be required to serve at least 93 years of his 100-year sentence, had received such a sentence. *Id.* ¶ 30.

¶ 19    Looking at the record as a whole, we were "not convinced that the trial court adequately considered [Pharoah's] youth and attendant circumstances" before imposing this mandatory

*de facto* life sentence. *Id.* ¶ 32. We noted the trial court's stated belief that for some crimes, "you pretty much forfeit your right to be ever out on the street again" (internal quotation marks omitted) and were unable to conclude that the judge had "carefully considered [Pharoah's] youthful characteristics against [the relevant] aggravating factors before coming to the ultimate conclusion that [he] was 'the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility,' rather than *** 'unfortunate yet transient immaturity.' " *Id.* (quoting *Montgomery v. Louisiana*, 577 U.S. 190, ___, 136 S. Ct. 718, 734 (2016)). We thus vacated Pharoah's sentence and remanded for resentencing.

¶ 20    We made clear in our opinion that Pharoah could elect to be resentenced on remand under section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2020)), which now specifically requires sentencing judges to consider the youth-based factors set out in *Miller* before imposing a sentence of any duration on a juvenile offender and which also gives courts the discretion to decline to impose firearm enhancements when sentencing juveniles. *Morris*, 2017 IL App (1st) 141117, ¶¶ 34, 37, 44.

¶ 21                    C. Resentencing on Remand

¶ 22    Private defense counsel was appointed to represent Pharoah on remand because the Public Defender's Office had a conflict of interest—it represented Pharoah's mother, who was charged with the attempted murder of Pharoah's brother. At status conferences leading up to the resentencing hearing, the trial court noted that *People v. Buffer*, 2019 IL 122327, ¶ 40, had been decided, in which our supreme court held that a sentence of more than 40 years is a *de facto* life sentence. The court also observed that *Miller* and the cases that had followed it, including *Reyes* and *Buffer*, were all concerned with sentences of life in prison *without parole*. If Pharoah was eligible for parole, the court asked, "[did] those cases apply at all?" The State took the position

that they did not. "In other words," the court said, "he could get the same sentence he got before."

¶ 23    Defense counsel agreed. "I still think, though," he noted, "that the Appellate Court's opinion [was] that it would be mandatory [for] this court [to] take into consideration [Pharoah's] youth at the time of sentencing." The trial court accepted that this was true but believed our opinion had been only a "soft reversal." He then expressed some frustration with his task on remand, noting that this court "did not say the sentence was wrong" but were now asking him to "consider the fact that [Pharoah] was a young guy." He may not have mentioned Pharoah's specific age, but the judge was sure he had noted at the original sentencing hearing that Pharoah was "a young guy" and "[a] young guy is a young guy." The judge said, "I just think it's in some respect ridiculous."

¶ 24    Before the resentencing hearing, the parties submitted a joint memorandum on the status of the law governing juvenile sentencing. They noted that Pharoah was entitled to be resentenced under either the law in effect at the time of his offenses or the law in effect at the time of his resentencing, that the sentencing range for first degree murder was 20-60 years, that the sentencing range for attempted murder was 6-30 years, and that the firearm enhancements that had previously been mandatory were now discretionary. They gave an overview of the relevant case law, the codification in Illinois of the youth-based sentencing factors set out in *Miller*, and the new availability of parole for individuals who were under the age of 21 at the time of their crimes.

¶ 25    The judge began the resentencing hearing on November 22, 2021, by announcing that the Illinois Supreme Court had recently held in *People v. Dorsey*, 2021 IL 123010, ¶ 65, that day-for-day credit must be deducted when determining whether a lengthy, term-of-years sentence qualifies as a *de facto* life sentence under *Buffer*. The judge noted that the defendant in *Dorsey* had been sentenced to "a whole bunch of time" but that with day-for-day credit he might only serve 40 years. The judge's understanding was that in such a situation, "*Buffer* doesn't really apply and it is a

proper sentence." The judge noted that *Dorsey* "talked about eligibility for parole as well" and instructed the parties to direct the court's attention to this and any other relevant law, saying "put in what you want to put in and I will read what I think applies as well."

¶ 26     The parties waived opening arguments, and the State called Darryl Jackson, DeAntonio's father, to the stand to read his victim impact statement into the record. Mr. Jackson stated that his son was a 16-year-old high school student at the time of his death and had been senselessly killed because he tried to save his friend's life as they walked home from school.

¶ 27     The parties stipulated that, while incarcerated, Pharoah had been convicted twice for aggravated battery/great bodily harm to a correctional officer (for which he received concurrent sentences of three years and six months, respectively, to be served consecutively with his sentence in this case) and had additional felony charges of aggravated battery to a correctional officer in a third case that was still pending. An Illinois Department of Corrections report said that Pharoah had also been involved in a fight in 2017, in which he stomped on an inmate's head until warning shots were fired and the inmate had to be airlifted from the prison for medical treatment.

¶ 28     The State then pointed out to the court that although the PSI report indicated that Pharoah had been hospitalized for suicide attempts, the records detailing his three admissions to Hargrove Hospital—in 2006, 2007, and 2008—made no mention of suicide.

¶ 29     Pharoah's counsel introduced letters in mitigation from Pharoah's mother, fiancée, childhood friends, and former classmates, all attesting to his character and their belief in his capacity for change. Pharoah's mother explained that she was a single mother of five children and that, together, she and Pharoah had "battled with his mental health and learning disabilities" and had done "the best [they] could without any help." She asked the court to show mercy on her son and to understand that at the time of his offenses, Pharoah "was not stable enough to be on his own

and had limited decision-making skills."

¶ 30    Tazesia Rutley, a longtime friend of Pharoah's and his fiancée of one month, testified that Pharoah was a gentleman, always made her feel "safe and protected," and would "put others before himself and keep them out of harm's way." She pleaded with the court to give him a second chance because he was human, all humans make mistakes, and he was "willing to grow and change his life around if given the opportunity."

¶ 31    A brief discussion of the relevant law followed. The State noted that "a lot ha[d] changed *** since [Pharoah] was sentenced the first time around in 2014." It pointed out that under the new statutory sentencing scheme he had chosen to be resentenced under, Pharoah would have two opportunities to petition for parole—after serving 20 years in prison and again after serving 30 years. The sentencing judge found this significant. He agreed with defense counsel that a 100-year sentence, "without any of these mitigating factors," was a *de facto* life sentence but concluded that the law did not preclude such a sentence, so long as the relevant factors were considered. "I could reimpose the sentence I gave him before. I think," the court stated.

¶ 32    The parties then made their arguments. The State emphasized that two weeks before DeAntonio's murder, Pharoah had "popped out of no where [*sic*]" and shot Marvin Floyd off of his bicycle. After weeks of life-saving treatment, Marvin had survived. That had been an opportunity for Pharoah to reflect on what he had done, get rid of the gun, and "change his ways." Instead, the State argued, he and a friend were kicked out of school on the first day of classes, and Pharoah retrieved his gun and "ambushed" a group of students walking home from school. He shot Corey in the back as he was running away and shot DeAntonio when he came back to help his friend.

¶ 33    The State reminded the court that, while awaiting trial, Pharoah had made a "kill list" and

tried to hire a hit man to eliminate the State's witnesses. And he had continued to commit violent crimes in prison. The State did not seek a specific sentence on remand but urged the court to impose the discretionary firearm enhancements, saying, "[i]f there is one person that deserves discretionary add-ons, it is the defendant," and asked it to impose a sentence that would "tell people that no matter what age you are you can't just shoot people as they are running away from you."

¶ 34     Before allowing defense counsel to proceed, the judge questioned the State regarding whether, as a matter of law, he could impose the same 100-year sentence he had before. The following exchange took place:

> "THE COURT: Mr. Allen, do your thoughts at this point allow the Court, in your opinion at least, to reimpose the sentence I gave him before? Does your viewpoint allow me, within the law, to reimpose the same thing I gave him before, a hundred years all together? I am not saying I would or I wouldn't, but do you think I could?
>
> MR. ALLEN [Assistant State's Attorney]: The appellate court certainly indicated that they were not telling this court that you could not resentence him. The *Buffer* case seems to indicate a much lower number, but we are asking you to go outside of the *Buffer* restrictions because the defendant has earned it, earned it back in 2010 and continued to earn it while he has been picking up and getting convicted."
>
> THE COURT: *Buffer* does not preclude a sentence of more than 40 years?
>
> MR. ALLEN: Correct."

The judge then turned things over to defense counsel, noting that it was "kind of a tough act to follow" but instructing counsel to "[g]o ahead."

¶ 35     Defense counsel argued that the case had been remanded for the court to consider not just youth as an abstract concept but specific youth-based sentencing factors. Pharoah's upbringing,

counsel argued, was "deplorable" and "tragic." His father was in prison in another state, his mother had neglected him and put him in harm's way, and he was sexually abused by older women and introduced to illegal substances at a young age. Pharoah had been hospitalized for mental illness and his school had attempted to intervene to provide him with special education services, but his problems had persisted. Counsel argued that "[t]he *Buffer* court made it clear that *de facto* life" should be "the last resort of the court when fashioning sentences" and that punishment should be considered but also "the potential for rehabilitation and the hope of an entire life not being lost for sentences in the 80, 90, 100-year range." He asked for "a substantial deviation" from the sentence previously imposed and, specifically, for the court not to impose the now-discretionary firearm enhancements.

¶ 36    The court asked defense counsel if Pharoah's mental health struggles were all self-reported. Counsel acknowledged that, with the exception of the individualized education plan (IEP) documented by his school, they were, but he urged the court to find that the school's records lent credence to what Pharoah himself had reported.

¶ 37    The judge then made a preliminary pass through the youth-based sentencing factors, making clear that he was "not ruling on those things at [that] point" but "just asking, in effect, rhetorical questions." He concluded by saying that he had made "[j]ust a quick glance" and "not a thorough reading," but he was "not jumping up and down in Pharoah Morris's favor at [that] point." He then asked defense counsel, "do you feel like I can consider more sentence than 40 years?" Counsel replied:

> "[I]t is my opinion that the *Buffer* case and the mandate from the appellate court in this case is that sentences should be in that 40-year range for juveniles being sentenced outside of many, many, many extenuating circumstances.

*** That's what was contemplated, I believe, by the appellate court when this was handed down."

¶ 38 The sentencing judge responded that he believed that, in remanding the case, this court was "basically saying *** yeah, you can give him a hundred years, but think it over and see what you think." It was "a curious fact," he noted, and something he had "checked into," that the defendant in *Miller*, the seminal case on juvenile sentencing, was "still in custody serving whatever sentence he got back in those days, a life sentence." He concluded the hearing and took the matter under advisement, saying, "I will consider it. I will do what I think is the right thing to do. I always do what I think is the right thing to do."

¶ 39 Court reconvened on December 15, 2021. The sentencing judge opened by reiterating that in *Miller* the defendant, who was only 14 at the time of his crime, had recently been resentenced to life without parole. That showed, the judge said, that although cases had come down over the years "with favorable dispositions for juveniles," they "[did] not preclude a life sentence." The sentencing judge noted that, although there were now "certain issues you have to deal with" in order to "make a life sentence work," the case law "d[id] not preclude that possibility." The judge also noted that both *Miller* and *Buffer* talked about life or *de facto* life sentences "without parole." Unlike the defendants in those cases, however, Pharoah would be eligible for parole after 20 years and, if unsuccessful then, again after 10 additional years.

¶ 40 The judge then read the entire parole statute into the record, saying, "[i]t looks like this law was written with Pharoah Morris in mind." Although the sentencing judge expressed skepticism over whether Pharoah would ever be released on parole, noting that it was "almost a scary thought," he would at least be given a chance to get out of prison. In the court's view, that was all the law required.

¶ 41    Before announcing Pharoah's sentence, the judge said that he had "[o]ne more comment" and then he would be "done talking for today." He then briefly addressed each of the new statutory sentencing factors applicable to juvenile offenders:

"There's a statute that talks about considerations to take which I have done and there—I've considered all these different things *** they're statutory considerations.

The person's age, impetuosity, level of maturity at the time of the offense including the ability to consider risk and consequences of behavior, the present and cognitive or developmental disability or both if any.

Age. Yeah, 16.

Impetuosity. These are thought out crimes. Not impetuousness. He goes up to the guys on the street and shoots and kills one and shoots the other. I'm not sure what impetuosity has to do with that whatsoever.

Level of maturity. Well, Morris, for a 16 year old, was quite mature, and that's shown by his conduct at the jail. I want those witnesses taken care of. That shows conscientious thought on his part.

* * *

Present and cognitive or developmental disability. Well, special education classes.

*** [W]hether a person is subject to outside pressure including peer pressure, familial pressure, negative influences. While it's true that Morris says at the time of the incident or around that time at least he was a member of a gang. (Indecipherable) influenced one way or the other.

Two guys walking down the street from school. One guy riding his bike. Witnesses might've (indecipherable) something he had about the case itself. There's no peer pressure

on Pharoah Morris.

Familial pressure. Well, like I said before, his mother didn't treat him the best. No pressure on her part to go out and kill somebody however. ***

The person's family, home environment, educational, social background, including a history of parental neglect, physical abuse, other childhood trauma. Well, he was neglected by the mother and women he had to deal with sexually at his young age according to Pharoah Morris.

[P]otential for rehabilitation, evidence of rehabilitation or both. I'd say he hasn't shown it so far.

[He's had] crimes committed while he's in custody. One would see that if a guy is in custody awaiting trial or awaiting resentencing he'd be a model prisoner. He wouldn't want to get into it with the guards at the penitentiary or the guard at the jail or an inmate in prison somewhere. You want to be a model prisoner, rehabilitate, do your best you can to get out at some point or another.

* * *

Well, role of the offense? *** He killed the boy himself. There is no accountability issue there. Participation is he was the murderer. That's the participation of Pharoah Morris.

Planning. Well, who knows about the planning part. He walked up to two guys on the street with a gun on him. Maybe he had some bad thoughts already. Whether it was planned or not who knows.

Able to participate in his or her defense. Well, he had a good lawyer at trial putting forward (indecipherable). Lawyers cannot change the evidence in a given case. They could

put a little different spin on it. They can't change it.

* * *

The person's prior juvenile or criminal history. *** At the time of the murder he was on probation for aggravated robbery. ***

* * *

Prior juvenile history I already mentioned that the basis for aggravated robbery. Other information the Court finds relevant and reliable *** Well, he's not said anything in court. I won't hold that against him one twit. By his conduct, however, for what he's done he's not shown any remorse whatsoever. *** It's one thing after another for Pharoah Morris. Either on the street, in the penitentiary, in the county jail, wherever else he could find a suitable victim and he found plenty.

¶ 42    The court then imposed the same sentence that it had before—55 years for the first degree murder of DeAntonio Goss and 45 years for the attempted murder of Corey Thompson. The judge reiterated that Pharoah had "earned every single day" of that 100-year sentence by killing a 16-year-old boy, calling it all "a tragic waste."

¶ 43    The court denied defense counsel's motion for reconsideration, and this appeal followed.

¶ 44                                    II. JURISDICTION

¶ 45    Pharoah was resentenced on December 15, 2021, and timely filed his notice of appeal the same day. Our jurisdiction over this appeal is pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Mar. 12, 2021), governing appeals from final judgments of conviction in criminal cases.

¶ 46                                    III. ANALYSIS

¶ 47    The United States Supreme Court held in *Miller* that a statutorily mandated sentence of life without parole for a juvenile offender violates the eighth amendment's prohibition of cruel and unusual punishments because it deprives the sentencing court of the ability to consider the "diminished culpability and heightened capacity for change" inherent in youth. *Miller*, 567 U.S. at 479. This was deemed a new substantive rule of constitutional law with retroactive effect. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736.

¶ 48    In 2016 and 2017, our own supreme court extended *Miller*'s holding to include mandatory *de facto* life sentences—sentences so long that they are the functional equivalent of life without parole (*Reyes*, 2016 IL 119271, ¶ 9)—and discretionary life sentences (*Holman*, 2017 IL 120655, ¶ 40). However, as noted above, the supreme court's decision in *Holman* was just overruled by *Wilson*, 2023 IL 12766, ¶ 42. Our supreme court answered the question of how lengthy a sentence must be to constitute a *de facto* life sentence in 2019, when it decided in *Buffer*, 2019 IL 122327, ¶¶ 32, 34, 36-41, that sentences exceeding 40 years would be considered *de facto* life sentences. *Id.*

¶ 49                    A. Whether *Miller* Applies Here

¶ 50    The question initially raised by this appeal was whether the holding in *Miller* applies when a defendant has been sentenced to more than 40 years but will be eligible for parole after just 20 years. The State maintains, as the circuit court firmly believed, that *Miller* and its progeny have no application under these circumstances. It argues that our supreme court's decision in *Dorsey*, 2021 IL 123010, ¶ 65, holding that day-for-day good-conduct credit must be deducted when determining whether a sentence is a *de facto* life sentence under *Buffer*, compels this conclusion.

¶ 51    Several years ago, our legislature made parole available to individuals who were under the age of 21 at the time of their offenses and who are sentenced after June 1, 2019. See Pub. Act 100-

1182, § 5 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110(b)), and Pub. Act 101-288, § 10 (eff. Jan. 1, 2020) (amending and renumbering as section 5-4.5-115). Parole will thus be available to Pharoah, who was resentenced in 2021.

¶ 52     As Pharoah points out, and as the *Dorsey* court itself recognized, parole is a matter of legislative grace, while the day-for-day good-conduct credit at issue in *Dorsey* is closer to an entitlement; it generally *must* be awarded, and there are mechanisms for judicial review in place to ensure it is revoked only where warranted. See *Dorsey*, 2021 IL 123010, ¶¶ 60-61.

¶ 53     The impact of parole on the *Miller* requirements has been addressed by a number of courts in other states, where parole has been available for much longer than it has been in Illinois. Some of those courts have concluded that the mere possibility of parole does not, on its own, constitute a meaningful opportunity for release sufficient to bring a life sentence imposed on a juvenile outside the purview of *Miller*. In *State v. Patrick*, 2020-Ohio-6803, 172 N.E.3d 952, ¶ 33, for example, the Ohio Supreme Court concluded, based in part on the fact that the state's parole release rate from 2011 to 2018 was only 10 percent, that the difference between a life sentence with parole and a life sentence without parole was "*not material* for purposes of an Eighth Amendment challenge by [a juvenile] offender." (Emphasis added.) *Id.* ¶ 33. In *Howard v. Coonrod*, 546 F. Supp. 3d 1121, 1132 (M.D. Fla. 2021), a federal district court in Florida similarly concluded that by "detail[ing] out the ways in which Florida's parole system denies a 'realistic opportunity for release based on demonstrated maturity and rehabilitation,' " the plaintiffs in that case had sufficiently pleaded eighth amendment violations. The court in *Maryland Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *27 (D. Md. Feb. 3, 2017), likewise concluded that plaintiffs had "sufficiently alleged that Maryland's parole system operates as a system of executive clemency, in which opportunities for release are 'remote,' rather than a true

parole scheme in which opportunities for release are 'meaningful' and 'realistic.' "

¶ 54    The State directs our attention to *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56, where this court concluded—in the context of a young-adult offender's argument that he was the functional equivalent of a juvenile—that a sentence providing the opportunity for parole before 40 years have passed "simply does not implicate *Miller*." See also *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 42 (reaching the same conclusion in the same context). Our supreme court has not yet addressed the effect of parole on its *Miller* jurisprudence.

¶ 55    However, we need not decide the impact of the availability of parole in this case because, as noted below, it can be resolved on statutory grounds. In addition, this question may also be moot in light of our supreme court's recent decision in *Wilson*, 2023 IL 127666. *Wilson* overruled *Holman*, 2017 IL 120655, ¶ 40, which had held that *Miller* applies to discretionary, as well as mandatory, life sentences. *Wilson*, 2023 IL 127666, ¶¶ 29, 41-42. Under *Wilson*, so long as a juvenile offender "was sentenced under a sentencing scheme that granted the sentencing court the discretion to consider [his or her] youth and attendant circumstances and to impose less than a *de facto* life sentence," and so long as it is also "clear from the record that the sentencing court did not *refuse*, as a matter of law, to consider [the defendant's] youth" (emphasis added), the defendant will be found to have "received the constitutionally required procedure under *Miller*." *Id.* ¶ 44. It is clear in this case that Pharoah received a discretionary life sentence. The minimum sentence for first degree murder is 20 years in prison (730 ILCS 5/5-4.5-20 (West 2020)), the minimum sentence for attempted first degree murder is 6 years (720 ILCS 5/8-4(c)(1) (West 2020); 730 ILCS 5/5-4.5-25(a) (West 2020)), and, as noted above, the firearm enhancements that were once mandatory were discretionary on resentencing. Because the court had the discretion to give Pharoah a sentence as low as 26 years, it would appear after *Wilson* that no eighth amendment

claim is available to him.

¶ 56    In his response to the State's motion for leave to cite *Wilson* as supplemental authority, Pharoah points out that *Wilson* specifically left unanswered the question of whether more is required of a sentencing court under the proportionate penalties clause. He maintains that courts are still required, following careful consideration of the youth-based sentencing factors articulated in *Miller*, to make a finding of permanent incorrigibility before imposing a life or *de facto* life sentence on a juvenile. Pharoah did not make a separate proportionate penalties clause argument on appeal but did refer to the clause several times in his briefs.

¶ 57    There is no need for us to decide either of these constitutional issues where, as discussed below, this case can be decided solely on nonconstitutional grounds. Our supreme court has repeatedly admonished this court that "cases should be decided on nonconstititional grounds whenever possible," with constitutional issues reached "only as a last resort." *In re E.H.*, 224 Ill. 2d 172, 178 (2006).

¶ 58       B. The Sentencing Judge was Predisposed to Impose the Same Sentence on Remand

¶ 59    The youth-based sentencing factors set out in *Miller* were adopted by our General Assembly and are now codified in section 5-4.5-105(a) of the Code. There is no question, with or without the availability of parole, that the trial court was required to consider those statutory factors on remand. See 730 ILCS 5/5-4.5-105(a) (West 2020) ("the court *** *shall* consider the following additional factors in mitigation" (emphasis added)). Nor do we believe our supreme court's decision in *Wilson*, which deals exclusively with what is required under the eighth amendment, has any bearing on our assessment of whether that was done here.

¶ 60    We generally review a trial court's sentencing decision for an abuse of discretion (*People v. Stacey*, 193 Ill. 2d 203, 209 (2000)), and the State emphasized at argument that this is a very

deferential standard of review. Pharoah's argument here is that the court was predisposed to impose a certain sentence and failed to keep an open mind while considering the relevant factors and evidence during the resentencing hearing. We must consider, then, "whether the trial court did, in fact, exercise its discretion or whether it abused that discretion by acting in an arbitrary manner." *People v. Bolyard*, 61 Ill. 2d 583, 586-87 (1975) (concluding that it was an abuse of discretion for the court to arbitrarily refuse to consider probation as a possible sentence).

¶ 61  We will order a new sentencing hearing where a judge's comments on the record indicate that he or she has predetermined a defendant's sentence before considering the relevant statutory factors. We did so in *People v. Zemke*, 159 Ill. App. 3d 624, 629 (1987), where it was "apparent that [the judge] would not have considered sentencing the defendant to anything less than the maximum term" for a crime that the judge personally considered "more reprehensible than murder." And we did so in *People v. Coleman*, 212 Ill. App. 3d 997, 1002 (1991), where immediately after finding the defendant guilty, and before any evidence in mitigation or aggravation had been presented, the trial judge stated that he was " 'contemplating the maximum [sentence] just to get [the defendant] off the streets and try to get him some treatment.' "

¶ 62  Resentencing is likewise appropriate where the judge's comments reveal that he or she refused to consider the whole range of statutorily permissible sentences. In *Bolyard*, 61 Ill. 2d at 585, for example, our supreme court remanded for resentencing before a new judge where it concluded that the sentencing judge had refused to consider probation as a possible sentence. *Id.* at 587. We did the same in *People v. Kendrick*, 104 Ill. App. 3d 426, 435-36 (1982).

¶ 63  Here, we agree with Pharoah that the record as a whole demonstrates that the sentencing judge was preoccupied with whether he could simply reimpose the same 100-year sentence on remand—something the State had not even asked him to do. He raised the question with both the

State and with defense counsel on multiple occasions before, during, and after the resentencing hearing ("In other words, he could get the same sentence he got before."/"I could reimpose the sentence I gave him before. I think."/"Does your viewpoint allow me, within the law, to reimpose the same thing I gave him before, a hundred years all together?") He also seemed to view the youth-based sentencing factors, not as considerations meant to assist him in choosing from among the whole range of possible sentences but rather as "certain issues you have to deal with in order to make a life sentence work." This results-driven approach is not what the statute contemplates and was an abuse of discretion. Pharoah must be sentenced a third time, by a judge who will adhere to the legislature's directives regarding the sentencing of youthful offenders, while remaining open to all possible sentences.

¶ 64     Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to order that a case be assigned to a different judge on remand. *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45. We find that the interests of justice would be furthered by the exercise of that discretion here. Pharoah has been sentenced twice by the same judge. To ensure that both he and the State are able to approach resentencing with confidence that the judge will properly apply the current law with no predisposition based on what sentence might have been appropriate under a sentencing structure that is no longer in place, we direct the presiding judge of the criminal division to assign this case to a different judge within that division.

¶ 65                                    IV. CONCLUSION

¶ 66     We vacate Pharoah's 100-year sentence and remand this case to the presiding judge of the criminal division of the circuit court with directions to assign the case to a different judge for resentencing.

¶ 67     Reversed and remanded with directions.

*People v. Morris*, 2023 IL App (1st) 220035

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-17983; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Melinda Grace Palacio, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, and Margaret M. Smith, Assistant State's Attorneys, of counsel), for the People. |