2024 IL App (1st) 211543
No. 1-21-1543
Opinion filed August 9, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04 CR 10345 |
| ANGEL NAVARRO, | ) ) ) | The Honorable Stanley J. Sacks, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1 Actual innocence claims are an indispensable mechanism against wrongful convictions, one of the gravest injustices known in law. When faced with an actual innocence claim, courts bear a solemn responsibility to ensure that justice emerges clad in the robes of rectitude.

¶ 2 Angel Navarro argues that his successive petition asserted newly discovered evidence that bore on actual innocence. We agree. Navarro has raised the sliver of doubt necessary to establish a "colorable claim" and advance to second-stage postconviction proceedings. His pleading contains newly discovered evidence unavailable at the time of trial in the form of the investigating

officer's prior record of police misconduct, which is material to his guilt or innocence, is non-cumulative in nature, and could potentially undermine the verdict.

¶ 3                                    Background

¶ 4     In April 2004, Josue Guerra was killed after being shot in the back. A short time later, police arrested Navarro on a nearby parkway. Witnesses Artemio Magdaleno, Heber Garcia, and Carlos Colon testified that Navarro shot at Guerra three times.

¶ 5     According to Magdaleno, that night, he, Guerra, and some friends were walking to a store on Fullerton Avenue, when they encountered Navarro with a group of about five or six men. Navarro asked them, "what [*sic*] you looking at?" According to Magdaleno, one of his friends replied, "we ain't [*sic*] looking at you." After that, Magdaleno, Guerra, and the others continued to the store. After they left, the group went through an alley to Leclaire Avenue and then proceeded on Leclaire Avenue towards Montana Street. As they did, Magdaleno heard a gunshot and bent down. Looking across Montana Street, Magdaleno saw Navarro's face. Magdaleno ran home but later returned as Guerra was placed into an ambulance.

¶ 6     On cross-examination, Magdaleno maintained that, although it was dark outside during the shooting, he could see Navarro's face lit from the gun firing. Magdaleno said some of his friends stood between him and the shooter and ran towards him during the shooting but did not block his view of Navarro.

¶ 7     Garcia and Colon were at home when they heard gunshots.

¶ 8     Garcia was unloading bicycles from his truck parked along Leclaire Avenue. He heard a gunshot coming from around the intersection of Leclaire Avenue and Montana Street. He turned and saw Navarro, standing alone on Leclaire Avenue, pointing a gun. Garcia and wife dashed inside their apartment building. Garcia heard two more gunshots and saw Navarro walking along

the opposite side of Leclaire Avenue. He could "completely" see Navarro's face. Navarro had on a white or light-colored short-sleeved shirt and white pants. Garcia saw Navarro put a gun "somewhere in [his] clothes." Police officers arrived and yelled to Navarro, who ran with the officers in pursuit.

¶ 9    On cross-examination, Garcia conceded that he saw the shooter fire only the first shot and could not see the shooter for about 10 seconds, during which he and his wife went inside. Garcia estimated Navarro was about 30 feet away.

¶ 10    Colon was on the second floor of his apartment building, about 35 feet from Navarro. Just before the shooting, Colon was looking through his window to check on his car parked on the street. Colon heard a gunshot and saw the side and front of the face of someone holding a gun, whom he later identified as Navarro. He had an unobstructed view of the shooter; at least two streetlights lit the area. The shooter wore a white or light-colored shirt and cream-colored sweatpants. Colon saw the shooter put the gun in his waist after the shooting. Police officers soon arrived, and the shooter ran into an alley, at which point Colon lost sight of him. On cross-examination, Colon testified that it was dark outside.

¶ 11    Chicago police officer John Meer testified that he and his partner, Kevin Murphy, had been on routine patrol in a marked police squad car in the area of the shooting. Around 8:00 p.m., Meer heard gunshots, and they responded. On reaching Leclaire Avenue, Meer saw Navarro running north, away from Montana Street. During the State's questioning, defense counsel stipulated that Meer saw Navarro.

¶ 12    Meer stated that Navarro had on a white short-sleeved shirt and white or beige sweatpants. Meer made eye contact with Navarro, who stopped. But when Meer gestured to Navarro to come to the police car, Navarro ran through an alley. Meer went after him on foot. Meer estimated that

he was 15-20 feet behind Navarro. Meer saw Navarro pull a handgun from the waistband of his pants and hold it while running through the alley and then a gangway. Meer dashed through a parallel gangway to Montana Street and spotted Navarro standing on the curb, wearing a black hooded sweatshirt. Navarro took off again until Meer caught him in front of 5019 Montana Street.

¶ 13 Meer searched Navarro but denied that he recovered a cell phone. Navarro was sweating profusely and rubbing his hands on his clothes and the seat of the police car. Meer drove Navarro to the intersection of Leclaire Avenue and Montana Street for identification by Magdaleno, Garcia, and Colon. Navarro stood outside the police car, illuminated by either police flood lights or flashlights. He was wearing handcuffs and a black sweatshirt. All three identified Navarro.

¶ 14 On cross-examination, Meer testified that at no time did he see Navarro in possession of a black sweatshirt. Meer did not see Navarro put on the black sweatshirt nor where Navarro might have acquired it.

¶ 15 Chicago police officer Peter Larcher, a forensic investigator, arrived about 65 minutes after the shooting. Larcher swabbed Navarro's hands for gunshot residue and tested Navarro's black long-sleeved hoodie sweatshirt, white short-sleeved T-shirt, and sweatpants. Larcher testified that both Navarro's hands were "negative" for gunshot residue. Larcher stated, "If the person was in the vicinity of a gun that was fired or held a gun that had been fired, the test would come back positive." The squad car was never tested for gunshot residue.

¶ 16 Illinois State Police forensic scientist Robert Berk testified to why the gunshot residue tests could be negative. He said gunshot residue on a hand will transfer to everything an individual touches. Negative results indicated that Navarro did not discharge a firearm or that the gunshot residue particles were removed by some activity, not deposited, or not detected by the testing instrument.

¶ 17   Chicago police officer Roberto Serrano arrived to assist Meer and Murphy. Serrano searched the area with a flashlight because it was dark. After "five to seven" minutes, Serrano found a gun in the front yard of 5022 Montana Street and three spent 9-millimeter cartridges at the corner of Leclaire Avenue and Montana Street.

¶ 18   Forensic testing determined that the recovered handgun fired the cartridges and neither the handgun nor the cartridges contained fingerprints. The parties stipulated that DNA testing on the recovered handgun was inconclusive.

¶ 19                                      *Defense Witnesses*

¶ 20   Sonia Lugardo testified that she lived with Navarro in the neighborhood where the shooting took place. Around 8 p.m., Lugardo was leaving work when she received a cell phone call from Navarro, who had been at home with her children. According to Lugardo, she talked to Navarro for a few minutes and went home, arriving at about 8:15 p.m. Police were present throughout the neighborhood, and the streets were cordoned off.

¶ 21   Chicago Police Detective Demosthenes Balodimas testified that he interviewed Colon regarding his view of the shooting. Colon did not tell Balodimas that he was looking out his window at the time of the first gunshot but said he looked outside after he heard a gunshot.

¶ 22   Detective Dino Amato testified that he interviewed Navarro at the police station and could not recall if Navarro had a cell phone.

¶ 23   The jury convicted Navarro. The trial court sentenced him to 60 years' imprisonment for first degree murder, which included a sentencing enhancement of 20 years for personally discharging a firearm. 720 ILCS 5/9-1(a)(1) (West 2004).

¶ 24                                          *Posttrial Proceedings*

¶ 25    Navarro appealed, arguing ineffective assistance of counsel because trial counsel stipulated that "responding police officers saw defendant running on a street near the scene of the underlying fatal shooting shortly after that shooting." *People v. Navarro*, 378 Ill. App. 3d 1123 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23) (*Navarro I*). Navarro also argued improper rebuttal argument by the State and improper sentencing. The appellate court affirmed the conviction and sentence and corrected the mittimus. *Id.* The Illinois Supreme Court denied Navarro's petition for leave to appeal.

¶ 26    In December 2008, Navarro filed his first postconviction petition.

¶ 27    Navarro claimed that his trial counsel was ineffective for failing to file a motion to quash identification evidence because the show-up was overly suggestive, taking place near the scene with witnesses who saw him get out of the back of a police car. Navarro contended that the police should have conducted a line-up or photo array instead. Navarro also claimed that trial counsel was ineffective for failing to present mitigating circumstances during sentencing. As to appellate counsel, Navarro claimed his counsel's decision to ignore those issues constituted incompetence.

¶ 28    The postconviction court (Judge Stanley Sacks) summarily dismissed the petition on January 6, 2009, finding that the issues presented were "frivolous and patently without merit." Navarro appealed, and this court affirmed. *People v. Navarro*, 405 Ill. App. 3d 1201 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23) (*Navarro II*). The *Navarro II* court held that in dismissing the petition,

> "the [postconviction judge] found that trial counsel did not err in deciding not to file a
>
> motion to suppress the identification evidence because defendant failed to demonstrate that
>
> the show-up conducted by Officer Meer was overly suggestive. The [postconviction judge]

further held that even if counsel had filed a successful motion to suppress, the outcome at trial would have been the same because defendant could not escape the fact that the State presented three eyewitnesses who unequivocally identified him as the shooter." *Navarro II*, slip order at 4.

¶ 29 In 2013, Navarro moved for additional ballistics testing. Judge Sacks denied the motion. Navarro appealed, and in March 2016, this court affirmed because "IBIS testing of the bullet shells would not materially advance Navarro's claim of actual innocence." *People v. Navarro*, 2015 IL App (1st) 131550, ¶ 16 (*Navarro III*) (ballistics testing immaterial where several eyewitnesses identified Navarro as shooter).

¶ 30 In the meantime, Navarro filed a Freedom of Information Act (FOIA) request with the Chicago Police Department, seeking "records, reports, and statements pertaining to his case." See 5 ILCS 140/1 *et seq.* (West 2014). The Chicago Police Department did not produce the sought-after records until August 2017.

¶ 31 In November 2019, Navarro moved *pro se* for leave to file a successive postconviction petition. He alleged as cause that the FOIA request he filed in 2015 and the documents produced in 2017 created a reason that the claims he would raise could not be asserted in his initial petition. He alleged prejudice in that, had these documents been produced before trial and used, he would not have been convicted.

¶ 32 In the proposed petition filed with the motion, Navarro raised several claims based on the 14 documents he received: (a) a *Brady* claim that the documents contained favorable evidence improperly withheld (see *Brady v. Maryland*, 373 U.S. 83 (1963)), (b) a claim that the State knowingly used perjured testimony to obtain his conviction, relying on the documents which he alleged contradicted the State's trial evidence, and (c) ineffective assistance of trial counsel claim,

asserting that if the documents had been tendered, they were not shared with him nor were the contradictions with the State's trial evidence contained in them exploited by counsel. He also asserted actual innocence.

¶ 33    The postconviction court (Judge Sacks) summarized the exhibits attached to the petition as a "laundry list of claimed errors *** none of which adds anything of consequence to his allegations." The court denied leave to file the petition, finding that most of the documents were repetitious of matters raised at trial and, thus, could have been asserted on direct appeal and barred by forfeiture. The court also found Navarro failed to meet the cause-and-prejudice standard required to initiate a successive petition. Regarding the actual innocence claim, the court stated:

> "Navarro claims that he is 'actually innocent' based on alleged inconsistencies in written statements, (perjured testimony); that the weapon that he used in the murder was used in another crime and that he was not identified in that murder; that the arresting officer in his case supposedly lied in an unrelated case; that he was belatedly provided with the Freedom of Information Act materials. Navarro comes woefully short of establishing 'actual innocence.'[citing] *People v. Coleman* (2013), IL 113307 (2013)."

¶ 34                                        Standard of Review

¶ 35    We review the sufficiency of a postconviction petition *de novo* because it poses a legal question. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 36                                          Analysis

¶ 37    Each claim in a successive postconviction petition "must meet the applicable standard in order to advance to second-stage postconviction proceedings." *People v. Griffin*, 2024 IL 128587, ¶ 2; see 725 ILCS 5/122-1(f) (West 2018) (Post-Conviction Hearing Act (Act)). An actual innocence claim, as here, "does not depend on—and is separate from—a challenge to the

sufficiency of the evidence or an allegation of error in the court below." *People v. Reed*, 2020 IL 124940, ¶ 29.

¶ 38    *Griffin* recognized that the bar to successive postconviction petitions may be relaxed in two situations: (i) "if a petitioner can establish cause and prejudice for not raising the claim in an initial postconviction petition" (*Griffin*, 2024 IL 128587, ¶ 32 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002))) and (ii) when the petitioner shows "actual innocence," an exception not codified in the Act, but "well established under Illinois law" (*id.* ¶ 33 (citing *Robinson*, 2020 IL 123849, ¶ 42)). The pivotal inquiry is whether the evidence supporting the postconviction petition casts "the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48 (citing *People v. Coleman*, 2013 IL 113307, ¶ 97). Critically, the new evidence does not have to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* The new evidence raised need not totally "vindicat[e]" or "exonerat[e]" the petitioner. *Id.* ¶ 55.

¶ 39    Navarro first argues that the court mistakenly applied the cause-and-prejudice test instead of the colorable claim test, and the proposed successive petition asserted newly discovered evidence that bore on actual innocence. Because our review is *de novo*, we undertake the same analysis as the postconviction court without deferring to its reasoning.

¶ 40    The State asserts that even if cognizable as a freestanding claim of actual innocence, Navarro still failed to make a colorable showing of actual innocence. The State also complains that "[Navarro] did not include a claim of actual innocence in his proposed successive postconviction petition, but instead included a section 'addressing' actual innocence in his motion for leave to file." Navarro counters that additional documentation attached to the proposed successive petition,

particularly the record of professional complaints against officers Meer and Amato, sufficed to warrant the initiation of successive postconviction proceedings.

¶ 41 We find the motion for leave to file and accompanying petition with documentation compelling. See *People v. Edwards*, 2012 IL 111711, ¶ 24 ("[L]eave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence.").

¶ 42 Courts must not elevate form above substance in reviewing a *pro se* petitioner's inartful presentation. At this stage, our supreme court has established a low threshold for the survival of *pro se* petitions, like here, drafted by an individual without legal knowledge or training. See *People v. Hodges*, 234 Ill. 2d 1, 9, 11-12 (2009) ("*pro se* petition seeking postconviction relief under the Act for a denial of constitutional rights may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact"). "Petitions filed *pro se* must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed." *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48.

¶ 43 This court's opinion in *People v. Plummer*, 344 Ill. App. 3d 1016 (2003), provides guidance in evaluating the State's argument. See *id.* at 1020 (factual disputes raised by pleadings cannot be resolved by motion to dismiss at either first or second stage of postconviction proceedings—they only can be determined by evidentiary hearing). A *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim. *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32. In *Hodges*—albeit an appeal from a summary dismissal of a first postconviction petition—the court relied on the standard established in *Anders v. California*, 386 U.S. 738 (1967), that "legal points arguable on their merits" are "not frivolous." *Id.* at 744; see *People v. Boclair*, 202 Ill. 2d 89, 101

(2002) (defining " '[f]rivolous' " as " 'of little weight or importance: having no basis in law or fact' "; defining " '[p]atently' " as " 'clearly, obviously, plainly' "; and defining " '[m]erit' " as " 'legal significance, standing, or importance' " (quoting Webster's Third New International Dictionary 913, 1654, 1414 (1993); Black's Law Dictionary 677, 1147, 1003 (7th ed. 1999))).

¶ 44    We agree with Navarro that we must decide whether, as a matter of pleading, he has set forth enough to warrant an opportunity to present his claims with the assistance of counsel.

¶ 45    The weakness of the State's case involves (i) the arresting officer's testimony that he chased a man in a white T-shirt but arrested a man in a black sweatshirt and (ii) the inherently suggestive and unreliable show-up procedure substituted for a line-up or photo array. The police brought Navarro before the witnesses (two of them simultaneously) while handcuffed, illuminating him with flashlights and possibly a spotlight and asking if this was the shooter. Navarro maintains that recently acquired evidence of misconduct by Meer raised a colorable claim of actual innocence.

¶ 46    The State next contends that even if as newly discovered evidence of a pattern of misconduct, the petitioner's claim fails because that evidence is immaterial and cumulative. We reject the State's argument as contrary to the law. "Evidence is material if it is relevant and probative of the petitioner's innocence." *Robinson*, 2020 IL 123849, ¶ 47. Moreover, evidence is noncumulative when it "adds to the information that the fact finder heard at trial." *Id.*

¶ 47    The issue of Meer's credibility is material. Meer claimed to have seen Navarro pull a gun out during a foot chase, but he could not explain how Navarro emerged from the alleyway wearing a black sweatshirt just 10-15 seconds after Meer lost sight of him. Meer did not see a black sweatshirt before the abrupt change of clothing, during which Navarro was running. And evidence

of Meer's background was noncumulative—the jury had no basis to know about or evaluate his credibility in light of the Office of Professional Standards files.

¶ 48    As in *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 186, where evidence of police misconduct was newly discovered and had the potential to alter the outcome, "[e]ven one incident of similar misconduct by the same detectives can be sufficient to show intent, plan, motive, and could impeach the officers' credibility." We find that Navarro's motion for leave to file a successive postconviction petition should have been allowed and the petition advanced to the second stage.

¶ 49                        On Remand

¶ 50    Finally, in our review of postconviction dismissals, we must be mindful of the postconviction judge's predisposition resulting from years of presiding over a particular defendant's proceedings and later in postconviction proceedings. Navarro's trial concluded in 2004, followed by sentencing shortly after. Over the next 20 years, as Navarro appealed his conviction and sentence, the same judge issued orders that denied every petition with generally similar content indicative of nominal consideration.

¶ 51    Under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), a reviewing court may, at its discretion, order any relief that a particular case may require, including "reassign[ing] a matter to a new judge on remand." *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002).

¶ 52    Our supreme court instructs that "ordinarily the fact that a judge has ruled adversely to a defendant in either a civil or a criminal case does not disqualify that judge from sitting in subsequent civil or criminal cases in which the same person is a party." *People v. Vance*, 76 Ill. 2d 171, 178 (1979). But a new judge can be assigned if there is "[s]omething more" than a previous adverse ruling. *Id.* at 181; see *People v. Reyes*, 369 Ill. App. 3d 1, 26 (2006) (trial judge replaced

on remand for second stage postconviction proceedings because addressing merits of new evidence regarding coerced confessions was inappropriate).

¶ 53    " '[S]omething more' " includes a display of " 'animosity, hostility, ill will, or distrust' [citation], or 'prejudice, predilections, or arbitrariness' [citation]." *Reyes*, 369 Ill. App. 3d at 25; see *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45 ("Even where the court gave lip service to the standard it was supposed to apply, the court clearly did not adhere to that standard.").

¶ 54    This burden of "something more" was recently met in a case involving Judge Sacks. In *People v. Morris*, 2023 IL App (1st) 220035, ¶¶ 1-2, Judge Sacks initially sentenced a 16-year-old to 100 years in prison and, on remand from this court, reimposed the same sentence. *Id.* This court found Judge Sacks was "preoccupied" with whether he could reimpose the same sentence on remand. *Id.* ¶ 63. This "results-driven approach" to the new sentencing statute was "not what the statute contemplates and was an abuse of discretion." *Id.*; see also *People v. Scullark*, 2024 IL App (1st) 220676-U, ¶ 99 (innocence claim before Judge Stanley Sacks remanded for second-stage proceedings before different judge).

¶ 55    Judge Sacks's 2021 order gives short shrift to Navarro's arguments. The order's analysis begins with the conclusion that "[a]ll of the claims asserted in the successive petition were either raised or could have been raised in the initial petition." As we have explained, this conclusion is incorrect. The order reflects a lack of close review indicative of prejudice, predilections, or arbitrariness, thereby constituting "something more."

¶ 56    In the interests of fairness and justice, this case is reassigned to a different circuit court judge on remand. The Office of the State Appellate Defender is appointed to represent Navarro.

¶ 57    Reversed and remanded for second stage proceedings with instructions.

---

*People v. Navarro*, **2024 IL App (1st) 211543**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 04-CR-10345; the Hon. Stanley J. Sacks, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Robert Hirschhorn, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian A. Levitsky, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |

---