2016 IL App (1st) 133493
No. 1-13-3493

SECOND DIVISION
June 7, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 93 CR 18173 |
| | ) | |
| ARMANDO SERRANO, | ) | |
| | ) | Honorable Maura Slattery Boyle |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Justices Neville and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal is taken from a directed finding that was entered in a postconviction

proceeding stemming from a murder case 22 years ago. The principal witness from the trial has

since submitted an affidavit that the trial testimony he gave was "false in all respects" and it was

coerced by the detectives investigating the murder. A number of other witnesses have provided

testimony that they were coerced to falsely implicate people in crimes by the same detectives. At

their joint evidentiary hearing, Serrano [1] and codefendant Montanez presented profoundly alarming acts of misconduct in the underlying investigation and prosecution, all of which warrant closer scrutiny by the appropriate authorities. Because we find that, after reviewing the evidence in the light most favorable to petitioner, Serrano has met his burden to go forward on an actual innocence claim, we reverse and remand. Any other result would work a palpable injustice.

¶ 2                                        BACKGROUND

¶ 3      On February 5, 1993, Rodrigo Vargas was found shot to death. Vargas was in his own driveway sitting in his van with the motor running. Neighbors had heard shots fired about an hour and a half earlier. Vargas's body was examined by the Cook County medical examiner's office, which determined that his death was a homicide resulting from multiple gunshot wounds. The victim had his wallet with $190. One neighbor, Gary Shoop, indicated that he was awakened by the sound of several gunshots and looked out his window to see a car traveling away quickly. He identified the car as a brown sedan, a General Motors' make. The timeline of the investigation and what occurred during the investigatory period is hotly disputed by the parties.

¶ 4      Wilda Vargas, the victim's wife, originally told the investigators that she had no idea who would want to kill her husband. At trial, Wilda testified that the night before the murder, she was out running errands with her husband and children. They stopped at a bank and then proceeded to a gas station. Wilda said that while they were parked at a gas station and her husband was inside paying, a cream-colored four-door car with a brown top pulled in behind them, blocking them in.

---

[1] The defendants in this case are Jose Montanez, Armando Serrano, and Jorge Pacheco. Jorge Pacheco was acquitted. Serrano was convicted along with Montanez who has also filed a postconviction petition. The trial court held a joint evidentiary hearing for Montanez and Serrano, but each filed a separate appeal. The opinion adjudicating Montanez's appeal, *People v. Montanez*, 2016 IL App (1st) 133726, overlaps almost entirely with this opinion and is being filed concurrently.

She testified at one point that an occupant of the vehicle entered the gas station while her husband was inside. At another point, she testified that copetitioner Montanez entered the gas station after her husband had already paid and exited the store. Because they had just left the bank, Rodrigo had cash, about $350. When Rodrigo came back to his car and it was still blocked in, he was agitated and honked the horn and cursed before the other car drove off. The subject car followed them for a period after they left the station.

¶ 5    Wilda originally identified petitioner as the driver, but then switched her identification to copetitioner Montanez. Wilda at one point testified that four days or so after the murder, February 8 or 9, she was accompanied by detectives Earnest Halvorsen and Reynaldo Guevara as they went back to the subject gas station. She later testified that this took place four months after the murder. Wilda and the detectives drove around the area to look for the vehicle she had seen the night before the murder and she testified that she was able to identify the car parked at a residence in the neighborhood. The car she supposedly identified belonged to copetitioner Montanez.

¶ 6    Another individual, Francisco Vicente, also testified against the defendants. Vicente is an admitted heroin addict who had four felony cases pending against him at the time. He was also concurrently a State's witness in two other murder cases being investigated by Detective Guevara in which the perpetrators supposedly confessed their crimes to him. While he was incarcerated on other charges, Vicente reportedly told detectives Halvorsen and Guevara that the three defendants in this case had confessed to him. His testimonial narrative was that around 8 or 9 the same morning that Rodrigo Vargas was murdered, he came across defendants, whom he knew. Vicente testified that he saw that defendants had a gun, and overheard their conversation which revealed that defendants were upset because they had unsuccessfully attempted to rob someone and in the

fallout they had to kill the person. Vicente testified that copetitioner Montanez said that defendants had seen a Mexican guy at a gas station the night before who pulled out a big wad of money, so they decided to rob him. Defendants, however, waited until the next day to attempt the robbery since the guy's wife and children were in the car that night.

¶ 7    Vicente ultimately received the mandatory minimum sentence of 9 years for his pending felony cases despite facing up to 100 years in prison. While in prison, Vicente received perks like cigarettes, a radio, home-cooked meals, and other things not generally available to inmates.

¶ 8    Detective Halvorsen also testified in the State's case. Halvorsen stated that he was questioning Vicente as a witness in another investigation when Vicente revealed that he had information regarding the murder of Rodrigo Vargas. It was June 2, 1993, about four months after the murder. It was just the two of them in the room. Halvorsen had heard unsubstantiated rumors on the street that someone by the name of "Pistol Pete" was involved in the Vargas murder. Vicente claimed that the rumored information was correct and that the "Pistol Pete" involved was copetitioner Montanez and that the co-offenders in the murder were "Mando" and "Jordan." Halvorsen claimed that through his database he was able to identify Mando as petitioner and Jordan as Jorge Pacheco. Those three individuals would later become the defendants in the case. Halvorsen claimed that later that day he told Guevara about the information gleaned from Vicente. Halvorsen's testimony was that it was at this point that the detectives visited Wilda Vargas, drove with her to the gas station, and then drove her around the area, where she identified Montanez's car as the one that had been behind them at the gas station the night before the murder.

¶ 9    Halvorsen testified that he also received a call around this time from Sergeant Minghey. Minghey purportedly told Halvorsen that an individual being held by the police, Timothy Rankins,

had claimed to be an eyewitness to Rodrigo Vargas's murder. Halvorsen testified that he and Guevara interviewed Rankins and, to verify his story, they drove in the direction of Vargas's home with Rankins accompanying them to test if Rankins could have really been an eyewitness. When they approached, Halvorsen testified, Rankins pointed to Vargas's home as the place that he had witnessed the murder. Rankins testified before a grand jury about what he apparently witnessed, but did not testify at trial.

¶ 10    No eyewitness testimony was presented at trial nor was there any physical evidence admitted. When making his ruling, the trial judge remarked that "were it not for the testimony of Vicente, there wouldn't have been much evidence here. His testimony is crucial." The trial judge specifically noted that Wilda's identification of petitioner was not reliable. The trial judge found the three defendants guilty of murder, but later reversed his own decision as to Pacheco and acquitted him only. The evidence against Pacheco is basically identical to the evidence against petitioner.

¶ 11    On May 26, 2004, Vicente completed an affidavit in which he recanted his trial testimony. He averred that his testimony against defendants at trial was "false in all respects." Going point by point, Vicente attested that the testimony he gave was supplied to him entirely by Detective Guevara and that he agreed to give the testimony as a result of threats, physical coercion, and promises of leniency for his own crimes. Vicente averred that he was also given money and received special treatment in prison in return for supplying false information in this case and in other cases, all at the behest of Guevara.

¶ 12    After accumulating some additional information, about a year after Vicente's recantation, petitioner filed a postconviction petition. Petitioner attached dozens of exhibits detailing other

instances of threats, intimidation, and physical abuse by Detective Guevara. Petitioner also asserted a claim for a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, a defendant's right to due process is violated if the prosecution in a criminal case does not disclose evidence to the defendant that is favorable to the defense. Serrano claimed that the police and prosecutors knew at the time of trial that Guevara had used threats, intimidation, and violence to coerce evidence in other cases.

¶ 13    A Cook County judge denied the State's motion to dismiss the postconviction petitions and advanced them to the third stage of postconviction proceedings for an evidentiary hearing. The cases were transferred to a new judge on October 1, 2009. Prior to the evidentiary hearing, in January 2012, petitioner sought additional discovery and requested leave to supplement his postconviction petition. The trial court denied the discovery sought by petitioner and refused to give him leave to supplement his petition, despite the fact that the evidentiary hearing would not be held for another 18 months.

¶ 14    On May 15, 2013, the evidentiary hearing began. At the hearing, Detective Guevara invoked his fifth amendment right, refusing to answer any questions on grounds that he might incriminate himself. When questioned in detail about the allegations of misconduct in this investigation, Guevara refused to answer each question, invoking his fifth amendment protections. Similarly, Vicente invoked the fifth amendment and refused to give testimony to backup his sworn recantation. There were several indications that he feared prosecution for having previously perjured himself at defendants' trial. Vicente did not take the opportunity to repudiate the content of the affidavit. Vicente told the court that he feared for his safety and he was escorted from the building.

¶ 15    Petitioner offered into evidence the transcribed statement of Timothy Rankins. Rankins described how Guevara used violence in an attempt to get him to incriminate the defendants in this case. Rankins testified about his reluctance to give the false testimony against them and the beating he suffered at the hands of Guevara and others. He swore that Guevara and Halvorsen gave him photographs of the three defendants in this case and a written statement and told him to study the material and, after some more beating, told him to sign the statement. Rankins claims that the statement he signed was false in its entirety as was his testimony before the grand jury. Rankins also corroborated claims made by Vicente, averring that the two of them were housed in the same protected prison block, receiving cigarettes, money, and the option of privately hosting female guests. Rankins swore that he and Vicente worked together to learn the false statements. Rankins stated that he eventually refused to provide false testimony at trial, though the detectives tried multiple times to persuade him to testify.

¶ 16    Valentin Gomez testified at the evidentiary hearing that he and Vicente were co-offenders in a case in 1995 or 1996, a year or so after Vicente testified against defendants. While they were incarcerated, Gomez was concerned that Vicente was in protective custody because he had flipped in the case they had together. Gomez testified that Vicente assured him that, no, he had not flipped in their case, but had falsely implicated these defendants in order to get a deal in his own pending cases. According to Gomez's testimony, three or four years later, he and Vicente came into contact again and they again discussed that Vicente had lied in this case. Gomez testified that Vicente expressed his desire to come clean about giving false testimony against defendants. Gomez, however, never reported the content of his conversations with Vicente to anyone prior to him being contacted in connection with these postconviction proceedings.

¶ 17   Petitioner called witnesses and introduced other sworn testimony at the evidentiary hearing in an attempt to establish Guevara's pattern of police misconduct. William Dorsch, a retired Chicago police department detective, testified about a case he worked on with Guevara a couple of years before this case came about. In that case, the detectives were conducting a photographic lineup with two supposed eyewitnesses. Dorsch testified that when one of the witnesses seemed unable to make an identification, Guevara pointed to one of the pictures and said "that's him." The witness then agreed with Guevara's suggestion and went on to identify the person in a live lineup. Dorsch conducted the lineup with the second witness by himself and the witness was unable to make an identification. The witnesses later admitted that their statements were false and that they were being paid by a third party. The charges against the accused were dropped. Dorsch, however, did not remember many of the particulars of the case such as the names of those involved. Dorsch also never reported the incident to his superiors and had since begun to work as an investigator with the Innocence Project and received compensation for his work.

¶ 18   Petitioner offered into evidence statements from more than a dozen individuals. Each of the statements details some type of coercion applied by Guevara to elicit a false statement. The allegations span decades and have some common threads among them. The trial court also barred the testimony of a significant number of other individuals who would have averred that they were abused or otherwise witnessed misconduct by Guevara. The trial court's reasoning for not allowing the evidence was that the testimony was too temporally remote or not similar enough to the allegations in this case.

¶ 19   The trial court also barred testimony from Wilda Vargas, the victim's wife and an important witness at trial. As an offer of proof, petitioner stated that if Wilda had been allowed to

testify, she would have testified that she was actually unable to identify a vehicle when she drove with the detectives, but that Guevara took her to the location of the vehicle and told her that it was the car from the gas station. It was him, not her who identified the vehicle. Wilda would have also testified that Guevara falsely told her that some bullet holes in the subject car matched the ballistic testing done at the scene of her husband's murder when they, in fact, did not. The court found that the testimony that would have been offered by Wilda, as described by defense counsel, did not warrant her testifying at the hearing.

¶ 20    At the close of the petitioner's case, the State moved for a directed finding. The trial court took the matter under advisement. About three months later, the court issued a 25-page written ruling granting the State's motion for a directed finding. In doing so, the trial court concluded that "[t]he evidence presented by petitioners in the instant case, taken in [the] light most favorable to the petitioners entirely fails to support their allegation that Detective Guevara forced Francisco Vicente to falsely implicate petitioners in first degree murder and attempted armed robbery." This appeal followed.

¶ 21                                    ANALYSIS

¶ 22    To obtain postconviction relief on the basis of a claim of actual innocence, a petitioner must present new, material, noncumulative evidence of such a conclusive character as would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. When we consider whether the evidence is "conclusive" we look at whether the new evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id*. ¶ 97. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2014)) gives the postconviction court wide latitude to receive proof by affidavits, depositions, oral

testimony or other evidence. *People v. Ruiz*, 177 Ill. 2d 368, 383 (1997).

¶ 23    Where, as here, the trial court grants a directed finding after petitioner's case at a third-stage evidentiary hearing, we review its decision *de novo*. *People v. Andrews*, 403 Ill. App. 3d 654, 659 (2010) (when no fact finding or credibility determinations are involved in a decision regarding a third-stage postconviction petition, we review *de novo*); *People v. Connolly*, 322 Ill. App. 3d 905, 918 (2001) (a ruling on a motion for a directed finding is a question of law subject to *de novo* review). The parties agree that *de novo* review is appropriate. When presented with a motion for a directed finding, the trial court is obliged to construe the evidence in the light most favorable to the nonmovant and may only grant the motion when the evidence so favors the nonmovant that a contrary ruling could never stand. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 136. Thus, the question here is: has the petitioner made a *prima facie* showing that the new evidence presented, taken in a light most favorable to him, would probably change the result if the case was retried. *Id*.; *Coleman*, 2013 IL 113307, ¶ 84.

¶ 24    To start, petitioner meets the situational requirement of presenting new, material, noncumulative evidence. The State did not move for a directed finding on the absence of any of those characteristics and the trial court's ruling was not based on a lack of presenting the proper type of evidence, but instead upon a supposed failure to meet the evidentiary burden. The State maintains that position on appeal.

¶ 25    At trial, the only direct evidence of petitioner's guilt was Vicente's testimony. Vicente supplied what amounted to a confession from defendants including details of the crime that swayed the fact finder. The trial judge commented, "were it not for the testimony of Vicente, there wouldn't have been much evidence here. His testimony is crucial." That "crucial" testimony is

now entirely repudiated in a sworn statement by the person who gave it. The witness now claims the testimony was "false in all respects." Detail by detail Vicente averred that the testimony he gave at trial was fed to him by Guevara, was coerced, and was not true.

¶ 26    There is not a large body of published case law in Illinois dealing with recantation evidence. As in nearly every jurisdiction, our courts have stated that recantations of trial testimony are to be viewed with suspicion. *People v. Lawson*, 65 Ill. App. 3d 755, 756 (1978). But a survey of persuasive cases throughout the country reveals that recantation statements should not simply be dismissed without further analysis. See, *e.g.*, *Lopez v. Miller*, 915 F. Supp. 2d 373, 402-08 (E.D.N.Y. 2013) (analyzing at length the considerations federal courts have given to recantation testimony); *United States v. Ramsey*, 726 F.2d 601, 604-05 (10th Cir. 1984) (where the witness himself files an affidavit averring that his trial testimony was false, the trial court must at least decide if the recantation is to be believed). That notion is especially valid in a case like this where the trial court is obligated to assess the evidence in a light most favorable to petitioner.

¶ 27    Even at the time of trial there were reasons to be concerned about the veracity of Vicente's testimony. He is an admitted heroin addict. He had a lengthy criminal history. He received a sentence of 9 years for four felony cases when he was facing 100 years in prison—a significant incentive to give testimony favorable to the government. Now, looking at all of those concerns with the additional sworn statement from the witness that the testimony was false, that previously *crucial* testimony is undeniably called into question. The recantation contains significant additional corroboration. Among other items discussed in more detail below, Timothy Rankins testified that he was coerced by Guevara to give false testimony against the defendants *in this case* and that he and Vicente rehearsed the testimony together and received special treatment in prison.

Valentin Gomez's sworn statement that Vicente admitted years before the recantation that he had falsely testified in this case, aids to rebut any indication of a recent fabrication. The totality of the corroboration evidence not only establishes the believability of the recantation, it demands that the evidence be weighed to determine whether the result would be different if there was a new trial.

¶ 28    In directing a finding for the State, addressing Vicente's recantation, the trial court found that "Petitioners have failed to present any evidence that Detective Guevara engaged in misconduct in their cases, and have been unable to present any evidence that Francisco Vicente provided false testimony at the behest of Detective Guevara." The trial court ignored Vicente's affidavit and Rankin's transcribed statement, both of which provide *direct* evidence of misconduct in this case and of Vicente providing false evidence at the behest of Guevara. Petitioner presented sworn evidence from the very witness who claims to have been under the influence of Guevara's misconduct. In addition, Timothy Rankins supplied a statement that Guevara tried to coerce him into giving false testimony in this case. He swore that the detectives gave him photographs of the three defendants and a written statement to sign. Rankins testified that the statement he signed was false in its entirety as was his testimony before the grand jury. Rankins also corroborated claims made by Vicente, averring that the two of them were housed in the same protected prison block, and that they received cigarettes, money, and other benefits in return for implicating these defendants. When Rankins eventually decided he would not falsely implicate defendants at trial, the detectives took away his special privileges and tried multiple times to solicit his false testimony.

¶ 29    The trial court found it especially significant that Vicente was cross-examined for well over 100 pages of the transcript, explaining that because petitioner failed to "show the very basis

for [his] claim," his claim is "meritless." Then, finishing its assessment of the worthlessness of Vicente's recantation, the trial court stated that "the evidence in the present case so overwhelmingly favors the State that no contrary verdict based on that evidence could ever stand." We profoundly disagree. Without Vicente's trial testimony, even the judge that presided over the trial would disagree with that characterization. That judge stated that without it, "there wouldn't have been much evidence here," so it is completely unclear how the other evidence in the case could now somehow be characterized as "overwhelming." When Vicente's recantation affidavit is examined under the proper directed finding standard, it is impossible to say that it does not even bolster petitioner's claim.

¶ 30    The trial court also failed to draw an adverse inference from Detective Guevara's invocation of the fifth amendment. Proceedings under the Post-Conviction Hearing Act are civil in nature. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). The privilege against self-incrimination may be invoked in any proceeding, civil or criminal, in which the witness reasonably believes that the information sought could be used in a subsequent criminal proceeding against him. *People v. Houar*, 365 Ill. App. 3d 682, 688 (2006). However, when the privilege is invoked in a civil proceeding, the trial court may sometimes draw an adverse inference that, had the questions been answered truthfully, the answers would have been damaging to the person invoking the privilege. See *id*. at 689. The issue is not addressed in the trial court's order.

¶ 31    While we need not expressly decide whether an adverse inference is ultimately warranted in this case, it is something the trial court should have at least considered at the directed finding stage. *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107. Guevara refused to answer probative, detailed questions about his misconduct in this very case.

¶ 32    The trial court then moved to the evidence offered by petitioner in his attempt to establish a pattern of misconduct by Guevara, going one by one through the statements offered by the other individuals. The trial court separately held that each of the individual's allegations against Guevara "fails to support petitioners' claim," typically because the evidence was either too remote in time or did not describe misconduct similar enough to that alleged in this case. Thus, the trial court held, none of the evidence supported petitioner's claim.

¶ 33    Petitioner offered or was prepared to offer evidence of Guevara's misconduct and witness coercion from more than 20 people, all from within a 10-year period. The trial court gave no compelling reason to entirely write off that evidence as either not admissible or not persuasive because of when the misconduct was said to have occurred. Although the specific allegations are not, nor would they be expected to be, 100% the same in every claim of misconduct, all of the allegations are that Guevara used coercion to get witnesses to make false statements. Many of the purported occurrences are actually quite similar. Almost all of the purported victims are Hispanic and many did not speak fluent English, giving Guevara the opportunity to coerce them more easily. The types of deception, the physical abuse described, and the other methods employed are not so disparate to convincingly demonstrate some sort of widespread fabrication of accusations against Guevara. There was even evidence from a Chicago police detective that worked alongside Guevara who testified about Guevara's willingness to procure false identifications in a manner corroborative of the other allegations made by the proposed witnesses here. As we stated in another case concerning Guevara's misconduct, "In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *People v. Reyes*, 369 Ill. App. 3d 1, 21 (2006). For the trial court to find the

aforementioned evidence totally unworthy of any credit when it was required to view the evidence in a light most favorable to petitioner is truly puzzling.

¶ 34    Certainly the proffered pattern of misconduct at least somewhat supports and corroborates petitioner's claim of misconduct as it relates to Vicente's sworn statement. The temporal connection to the evidence that Guevara coerced Vicente in this case and the similarity of the various allegations may go to the weight or credibility of the evidence, but it is still supporting evidence. In its order, the trial court states that "[i]n ruling on directed verdict, 'a court does not weigh the evidence, nor is it concerned with the credibility of witnesses.' " However, the trial court did just that. The purpose of all of this evidence about Guevara's purported misconduct was to support the sworn recantation by Vicente. As we observed in another case dealing with Guevara's history "it is at least arguable that, if the [fact finder] had known about Detective Guevara's history of improperly influencing witnesses, they might have [weighed testimony differently]." *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 79. If the evidence offered here does not meet the postconviction evidentiary threshold at the directed finding stage, then it is hard to imagine the threshold ever being met.

¶ 35    The State argues that the trial court's ruling should stand because petitioner did not meet his burden of going forward on a claim of actual innocence. In support of that argument, the State contends that there was evidence at trial that rebuts Vicente's false recantation and the false allegations leveled against Guevara. In particular, the State points to the trial testimony of Detective Halvorsen in which Halvorsen states that he was alone with Vicente when Vicente first implicated the defendants here. According to Halvorsen's testimony, it was only after Vicente gave evidence against defendants to him that Guevara even got involved. Therefore, the State

claims, Vicente's affidavit is totally refuted. We do not find this argument persuasive.

¶ 36     Even though this is the State's principal argument on appeal, the trial court's lengthy written order does not in any way rely on Halvorsen's testimony. The State does not even attempt to argue the trial court's analysis was sound. The trial court had no reason to disbelieve Vicente's recantation in favor of Halvorsen's trial testimony at the directed finding stage under the particular circumstances. In many of the cases where an individual has accused Guevara of misconduct, Halvorsen is accused of participating or at least being involved in the case. He is not some disinterested witness, especially after the myriad allegations of misconduct have been brought to light. Halvorsen's trial testimony about his one meeting with Vicente does not discredit all the postconviction evidence to the contrary when the postconviction evidence is viewed in the light most favorable to petitioner. If all of the evidence submitted in connection with this postconviction proceeding is proved to be true, including the accusations against Guevara, Halvorsen's trial testimony may well be consigned to oblivion.

¶ 37     The State then goes on to spend an extraordinary amount of its argument interposing reasons that the evidence offered by petitioner should not be believed, thereby falling into the same hole that the trial court did concerning itself with the veracity of the affidavit. The State is free to explore the veracity of the affidavit in its rebuttal of the evidence, but that has no bearing on whether petitioner met his burden to defeat a motion for a directed finding. See *supra* ¶ 28. The State uses several pages of its brief to describe why the narrative of petitioner's case is "illogical." But far from that, the evidence, when taken in a light most favorable to petitioner, is compelling.

¶ 38     The trial evidence that is not directly called into question by the postconviction evidence is extremely flimsy. The motive evidence is questionable, because Wilda Vargas's trial testimony

about whether petitioner had an opportunity to see the victim and his money while in the gas station was less than solid. The State's theory was that copetitioner Montanez was in the store while her husband was paying. But Wilda also at one point testified that her husband had already paid and exited the store before Montanez supposedly entered, which would vitiate the narrative that petitioner saw the money and decided to commit a robbery. Also, her husband was left with nearly $200 in his pocket when he was killed.

¶ 39    Wilda's testimony about observing petitioner's car when she was with the detectives is now all but refuted by her proferred testimony that the information was fed to her by Guevara. He supposedly told her which car to identify and then misled her about nonexistent ballistic evidence. The timing of when Wilda drove around with the detectives is also open to question. She originally testified that she drove around with the detectives and identified petitioner's car four days after her husband was killed, while the detectives' narrative was that she drove around with them several months after the murder. Wilda's identification testimony is also dubious. At the police station and in court, she made misidentifications of the defendants before settling on whom she saw and where she saw them. At trial, the judge commented that he found the majority of Wilda's identification testimony to be unreliable, and explicitly stated that her identification of petitioner was not reliable.

¶ 40    There were no eyewitnesses to the crime, and no physical evidence tied the defendants to the crime. No weapon was ever recovered. Vicente was Guevara's key witness in two additional murder cases at the same time this case was pending. In all three cases, the perpetrators supposedly confessed their murders to this same heroin addict. At the risk of belaboring the point, in making his ruling at trial, the judge acknowledged that "were it not for the testimony of Vicente, there

wouldn't have been much evidence here." Now, with everything presented at the postconviction evidentiary hearing, construed in the light most favorable to petitioner and with all inferences being drawn in his favor, the lack of evidence is distinctly concerning.

¶ 41 The corroboration of the new evidence and its consistency on key details, properly construed, is compelling. We have before us a recantation from the principal trial witness saying he was coerced by detectives, a partial recantation from the secondary witness (the victim's wife) saying she was misled by investigators, sworn statements from at least 20 individuals claiming that the investigators coerced them in a similar manner, and then the detective under suspicion coming to the hearing and invoking the fifth amendment in response to all of the pointed questions. At this stage in the proceedings, petitioner was required to make out merely a *prima facie* case that would cause the court to view the "evidence presented at trial in a different light and undercut[ ] the court's confidence in the factual correctness of the guilty verdict." *People v. Coleman*, 2013 IL 113307, ¶ 97. That has clearly occurred here. When all of the postconviction evidence is viewed in a light most favorable to petitioner, the trial court erred when it said that no contrary ruling could ever stand.

¶ 42 As for the trial court's evidentiary rulings about pattern and practice evidence, that evidence should have been allowed, consistent with our explanation in *Reyes* that "any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *Reyes*, 369 Ill. App. 3d at 21. Of course, there are some limitations attendant to the preceding statement, but, based on the offers of proof made by petitioner, all of the proffered testimony about Guevara's purported misconduct should have been admitted. Furthermore, the trial court erred in its ruling concerning the proffered postconviction testimony of

Wilda Vargas. It is immensely relevant and she should be able to testify about being manipulated by Guevara in this case. It might very well be the most important testimony in the case.

¶ 43    Petitioner acknowledges that the ordinary remedy here would be to remand the case for additional proceedings, but he asks that we skip that step and vacate his conviction outright. While we are sympathetic to petitioner receiving the wrong result in the trial court, we decline to disregard the strictures of the Post-Conviction Hearing Act and grant him the extraordinary relief requested. At this stage, we cannot consider the evidence offered to have proved anything. We cannot say, as petitioner suggests, that he has proved "total vindication." Petitioner tacitly acknowledges this fact a number of times in his argument but asks that we order a new trial despite not providing any authority for his request. The State has argued that it indeed has evidence to rebut and impeach the evidence offered at the evidentiary hearing. As stated in addressing the State's arguments, it believes Halvorsen's testimony is more credible than Vicente's recantation. The State also argues at great length why the recantation should not be credited at all, and why petitioner's theory of the case is far-fetched. The State is entitled to the opportunity to probe those supposed weaknesses.

¶ 44    Petitioner also argues that he is entitled to a new trial based on its *Brady* claim. Again, petitioner acknowledges that, in the ordinary course, the relief to which he would be entitled would be a remand to the trial court for a continuation of the proceedings. The *Brady* claim was not addressed at the evidentiary hearing—petitioner did not even mention it. Certainly the elements of a *Brady* claim cannot at this juncture be considered proved. There is nothing substantive in the record that compels us to take a claim not argued in the trial court and go so far as to order a new trial on its merits. The State is entitled to an opportunity to rebut that claim as well, and it argues

that it can.

¶ 45    The final issue in this appeal is that petitioner suggests we should remove the postconviction judge from the case and assign the case to a different judge on remand. Petitioner argues that since the postconviction judge has already ruled that no contrary verdict could ever stand and since the judge has expressed a disregard for the evidence presented, it would be essentially worthless to send the case back to the same judge. We agree. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) gives a reviewing court, in its discretion, the power to reassign a matter to a new judge on remand. *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43. Petitioner offered up an abundance of evidence to support his claim of actual innocence. The trial court turned a blind eye to much of the evidence, and also refused to admit probative, admissible evidence that, when evaluated under the proper standard, is damning. Even where the court gave lip service to the standard it was supposed to apply, the court clearly did not adhere to that standard. The postconviction court gave the impression that it was flatly unwilling to consider the evidence offered by petitioner. See *Reyes*, 369 Ill. App. 3d at 25. Petitioner would be prejudiced were we not to assign the case to a new judge on remand. Therefore, pursuant to the discretion conferred on this court by the supreme court rules, we find that the interests of justice would be best and most efficiently served by the case being assigned to a different judge on remand.

¶ 46                                        CONCLUSION

¶ 47    Accordingly, the trial court's judgment is reversed and its directed finding is vacated. Petitioner is entitled to supplement his petition on remand and to submit evidence supporting his *Brady* claim. The case is remanded to the presiding judge of the criminal division of the circuit court with instructions to assign the case to a different judge to adjudicate the reinstated third-stage

postconviction proceedings.

¶ 48    Reversed and remanded.