2026 IL App (1st) 240642-U

SECOND DIVISION
June 16, 2026

No. 1-24-0642

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 93 CR 00150-01 |
| | ) | |
| JEROME VONNER, | ) | Honorable |
| | ) | Marc W. Martin, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Third-stage denial of actual-innocence claim affirmed. Petitioner's evidence was not conclusive, as post-conviction DNA results had minimal probative value and circuit court did not err in finding hearsay evidence unreliable and not credible.

¶ 2   Petitioner Jerome Vonner filed a successive post-conviction petition alleging his actual innocence in the murder of Greg Hersey and requesting DNA testing of the clothing he wore on the night of the shooting. With the DNA results and three hearsay affidavits in hand, petitioner's claim proceeded to an evidentiary hearing. The circuit court found, in sum, that the hearsay (and double hearsay) evidence was not reliable, and that the lack of any detected blood on petitioner's clothing didn't prove much in the circumstances of this particular shooting. The circuit court thus found that petitioner's evidence was not conclusive and denied his petition. We affirm that ruling

over petitioner's claims of manifest error.

¶ 3                      BACKGROUND

¶ 4                      I. Trial evidence

¶ 5                      A. Hersey's murder

¶ 6      Greg Hersey was murdered on the evening of November 1, 1992, while visiting the home of Suzanne A., the mother of their 7-year old son, Jason. Suzanne and Jason lived together in an apartment in Elgin, where Suzanne openly sold cocaine. Her friend, Marita Johnson, often served as a lookout during drug deals, since the apartment was across the street from a police substation.

¶ 7      Shortly before midnight, three masked men came into Suzanne's apartment to rob her of her drugs and money. One of them fatally shot Hersey in the chest. Suzanne, Jason, and Marita were present and recognized petitioner despite his attempted disguise. Petitioner, a neighborhood local, had been a near-daily visitor to this drug house for the past several months and frequently played with Jason.

¶ 8      The day of the murder was no exception. A brief recap of the day's earlier events will suffice for our purposes. Suzanne and Marita started smoking cocaine together in the early morning hours. Hersey came over in the late morning. Petitioner joined not long after that. At Hersey's request, petitioner cut Hersey's and Jason's hair. Jason and Suzanne both took note of petitioner's Michael Jordan sweatpants. Sean West, whom Marita and Jason would identify as another one of the masked men, came over to buy drugs. Petitioner and one "Peewee" gave Suzanne a gaming console (intended for Jason) in exchange for cocaine, some of which they smoked while they were at Suzanne's apartment.

¶ 9      At some point, Hersey, petitioner, and Peewee went to the store. Suzanne's timeline of events was not always clear. But Kathy Davis, who worked at the Night Owl Foods a few blocks away, testified that they came in (with a fourth unidentified man) around 11:30 p.m. Davis knew them all, as she used to live with Suzanne and Hersey, and petitioner was a regular patron of the store. An argument broke out between petitioner and Hersey after petitioner grabbed Davis's breast and Hersey told him to stop. On their way out, petitioner pointed at Hersey and said, "I'm going to kill you." The men all drove away together, and Davis testified that she did not take petitioner seriously.

¶ 10     A few minutes before midnight, Hersey was back in the apartment, sitting in the kitchen with Suzanne. Jason was asleep on the couch. Marita was sitting on the couch, looking out the window, when she noticed three men approaching. Addressing Hersey, she said something like, "here come your friends," or "you said those guys would be back?" As Hersey walked into the living room, Marita answered the door. Three men came in and, in short order, a single gunshot was fired, accompanied by demands for money and drugs.

¶ 11     Here's how the events looked from each witness's admittedly limited perspective. First, Marita. She acknowledged at trial that she was high on cocaine at the time. And the shot was fired while she was on the floor, with her head down, as the men ordered her to do. But she recognized the voice demanding "the goddamn dope and the money" as that of petitioner. She also recognized West from the coat she saw him wearing earlier that day.

¶ 12     Suzanne made her way into the living room after hearing the gunshot. So like Marita, she did not see the shot being fired. But she did see petitioner holding the gun. Suzanne recognized

him from his Michael Jordan sweatpants and his voice. This was this voice that demanded they all "get down." As Suzanne recalled, it was West who demanded "the dope," and the third man who demanded "the money." Like Marita, Suzanne recognized West from his coat. In any event, Suzanne gave them her cocaine and said that Hersey, who was face down on the floor, had the money. The man with the gun—that is, petitioner—kicked Hersey, to get him to roll over, and took his wallet.

¶ 13    The knock on the door woke Jason. When Marita opened the door, petitioner, West, and Peewee came inside. Jason could not see their faces, since they wore masks, but he recognized them all the same. In particular, Jason recognized petitioner's Michael Jordan sweatpants and his shirt with a bull on it, both of which he saw petitioner wearing earlier that day, as well as the "C" cut into petitioner's hair, on the back of his head, which was visible through a rip in the mask or hood that he was wearing. Jason saw petitioner holding a gun. He then saw petitioner shoot his father and take the money.

¶ 14    After the men left, Hersey was holding his chest, his hand covered in blood. Suzanne now realized, for the first time, that he had been hit. Suzanne called 911 and scrambled to hide the drug paraphernalia in the garage before the police arrived.

¶ 15                          B. Events after the murder

¶ 16    Officer McGinley dispatched from the nearby police substation at 11:58 p.m. and arrived at the apartment within a minute. Upon finding Hersey unconscious and bleeding from his chest, he called for an ambulance and spoke to Marita while he waited for the paramedics and other officers to arrive. Without identifying anyone, Johnson gave a preliminary description of three

masked assailants, in dark hooded coats and ski masks, who fled westbound from the apartment.

¶ 17    Detective Linder arrived twenty minutes later, at 12:18 a.m., and began interviewing the witnesses. At 12:25 a.m., the phone rang. Suzanne answered, and after frantically motioning for Detective Linder to come listen in, she held the earpiece of the phone between them so he could hear. Petitioner was on the line. His "first statement" was, "How is Greg? What's happening up there?" Suzanne responded that Hersey had been shot and that she could not talk at the moment. Petitioner asked, "How's Greg? What are the police doing?"

¶ 18    Suzanne hung up, identified petitioner's voice for Detective Linder, and said that he was one of the assailants. But she did not yet name him as the shooter. That would come later, during a fuller statement that she gave at the station. So too for Jason.

¶ 19    Petitioner is keen to emphasize, as a general matter, that the initial statements at the scene were sparsely detailed and did not always square with the witnesses' later statements, in which they claimed to identify (some, or in Jason's case, all of) the assailants. True enough. But in all fairness, as Suzanne testified, the witnesses were understandably terrified in the immediate wake of the shooting, when these preliminary statements were made. Especially Jason, a 7-year-old boy whom the police found hysterical, crying over the sight of his bleeding, unresponsive father.

¶ 20    The police caught up with petitioner just moments after that telling phone call. At 12:30 a.m., Officer McGinley stepped outside and spoke to Sergeant Buck, one of the several other responders now on the scene. Sergeant Buck noticed two men who seemed to fit the descriptions that Officer McGinley was relaying to him. One of them was James Daniels—the man known to our witnesses as "Peewee." The other was petitioner.

¶ 21     To make a long story short, the officers spoke to petitioner on the front porch of a nearby apartment. As the police would discover, the apartment belonged to Diana Flanagan, Daniels's girlfriend at the time. Daniels stayed in Flanagan's apartment and considered it home.

¶ 22     During the conversation on the porch, petitioner asked, "How is he?" and "Where did he get shot?" Petitioner clarified that he was asking about "Greg." Officer McKinley asked how he knew that Hersey had been shot, since there hadn't been much time for word to get around, and petitioner said that he "just called the home." Officer McGinley touched base with Detective Linder, and when the detective came by, petitioner confirmed that he was the voice on the line.

¶ 23     Petitioner and Daniels agreed to go to the station. Detective Linder returned to Suzanne's apartment to finish his preliminary interviews, and those conversations, as noted, later resumed in more detail at the station.

¶ 24     Daniels testified, in the defense case, that he was at home with petitioner when Hersey was shot. Daniels acknowledged that he went with petitioner and Hersey to Night Owl Foods— but that, he said, was hours before the shooting. To Daniels's knowledge, petitioner did not grab Davis's breast or threaten to kill Hersey during an ensuing argument. After they left, Daniels dropped Hersey at "Sue's" apartment and went back home to smoke cocaine with petitioner in the basement.

¶ 25     And that's where they were when Hersey was murdered. Daniels knew this because he could see the police in front of "Sue's" apartment down the street. It seems that Daniels gave two slightly different versions of this story. At trial, he testified that he saw the police from the kitchen window while petitioner was making a phone call. In a pretrial interview with the lead

prosecutor, he reportedly said that they saw flashing lights from the basement.

¶ 26     Either way, Daniels and petitioner went outside to see what was happening. They were quickly stopped by the police, searched, and asked to come down to the station. During several rounds of questioning, Daniels testified, an assistant state's attorney and a detective—the allegation appears to be aimed at Linder—threatened to charge him with the murder if he did not "tell the truth." To put a finer point on it, as Daniels later did in his testimony, the detective and prosecutor said that they would "put" the murder on him unless he said that petitioner "snuck out of [the] house" to shoot Hersey and then "snuck back in."

¶ 27     The ASA who interviewed Daniels at the station denied these allegations in the State's rebuttal case. And Lisa Krull, a State investigator who was present for the pretrial interview noted above, visited the property to investigate Daniels's claims. She testified that there is no basement window. And whether Daniels and petitioner were in the basement or the kitchen, the street in front of Suzanne's building is not visible at all from Flanagan's apartment, which is in the back of her building. Daniels was not charged in this case.

¶ 28                                C. Physical evidence

¶ 29     There was a significant amount of Hersey's blood in Suzanne's apartment. The medical examiner opined that this was not a close-range shooting; rather, Hersey had a "distant gunshot wound." The fired shell casing was not recovered, and no other forensic evidence in Suzanne's apartment connected any particular suspect to the shooting.

¶ 30     The next day, the police searched Flanagan's apartment and another nearby apartment, a couple hundred yards from Suzanne's, where petitioner may have been staying with a relative.

(There was also some indication that he stayed with Daniels at Flanagan's apartment.) Neither search yielded the murder weapon, Hersey's stolen wallet, or any ski masks. Varying amounts of cocaine and/or drug paraphernalia were found in all three locations.

¶ 31    When petitioner was arrested, he was wearing a blue jacket with a bulldog emblem on the back, white sweatpants with a Michael Jordan image on the side, and a red Bulls t-shirt. These items were collected and admitted into evidence at trial. Gunshot residue swabs were collected from petitioner while he was in custody and sent to the FBI Crime Lab. The lab would not test the samples, however, because they were collected too long after the shooting for the results to be considered valid.

¶ 32                    D. Verdicts, sentencing, and proceedings on review

¶ 33    The jury convicted petitioner of first-degree murder, armed robbery, armed violence, and aggravated discharge of a firearm. The trial court sentenced him to an aggregate term of 55 years on the murder and armed robbery counts, and merged the remaining convictions.

¶ 34    Because there are no questions of forfeiture or *res judicata*, we can leave aside the details of petitioner's direct appeal (*People v. Vonner*, No. 1-95-0065 (Sept. 9, 1996) (Rule 23 order)) and initial post-conviction petition (*People v. Vonner*, No. 1-97-3660 (Oct. 26, 1998) (Rule 23 order)) and fast-forward to the successive petition at issue.

¶ 35    As noted, the successive petition alleges actual innocence and includes a request for post-conviction DNA testing of the clothing petitioner wore on the night of the murder. See 725 ILCS 5/116-3 (West 2024). The circuit court granted leave to file and appointed counsel in October 2012, and the petition slowly inched its way to an evidentiary hearing in March 2024. (By then,

petitioner had been fully discharged from his sentence.) During the nearly 12 years that passed, petitioner's clothes were tested for DNA, and appointed counsel filed a supplemental petition that added one more affidavit, this one from trial counsel, to the two that were included with petitioner's *pro se* filing. The evidence presented in the written filings, and in some cases, elaborated upon at the evidentiary hearing, is summarized below.

¶ 36                                II. Petitioner's actual-innocence claim

¶ 37    Petitioner offered four pieces of evidence to support his actual-innocence claim.

¶ 38    First, pursuant to his request for post-conviction DNA testing, the Illinois State Police tested the t-shirt, sweatpants, and coat that petitioner wore on the night of the murder. The lab report states that no blood or blood-like stains were indicated on any of these items. The same finding applies to a coat recovered from West.

¶ 39    Second, the supplemental petition included an affidavit from petitioner's trial attorney, Michael Bianucci, dated August 25, 2022. Attorney Bianucci did not testify at the hearing, but his affidavit was received into evidence. Sometime in 2004—between petitioner's initial and successive petitions—Attorney Bianucci met with Mary Hersey, the victim's mother, who had since passed away. Attorney Bianucci attests that Mary told him two things. For one, "she knew that [petitioner] did not commit the murder." Full stop. For another, when Mary went to the emergency room "in the early morning hours of November 2, 1992," after her son was shot, she saw Suzanne, Jason, and Johnson there together. Attorney Bianucci "would have cross-examined them about this fact" if he had been aware of it.

¶ 40    Third, petitioner obtained an affidavit from Deforest Clark, dated March 28, 2012. Clark

later changed his name to Kareem Solomon-Bey, for religious reasons, and testified under that name at the evidentiary hearing, so that is how we will refer to him. Solomon-Bey and petitioner had known each other for over thirty years, since they were children. In sum, in his affidavit and hearing testimony, Solomon-Bey said the following.

¶ 41    In 2011, Solomon-Bey attended a barbecue at a park in Elgin. He wore a t-shirt with a picture of petitioner's face and a caption that read, "Jerome Vonner wrongfully convicted." A man named Leo Gray commented on the shirt and said he knew that petitioner was innocent. To be clear, Gray never claimed to witness Hersey's murder. But he did share a (purported) hearsay confession to the murder with Solomon-Bey.

¶ 42    On some unspecified date, Gray gave three men a ride to and from an apartment in the Poplar Creek area of Elgin. (That is where Suzanne lived.) The men were Raymond Mims, "Major," and Delvin Payton. The apartment they were headed to, as far as Gray knew, belonged to Payton's girlfriend, Michelle Blake. Gray did not know what they were up to, and he stayed in the car while they went inside. Gray did not claim to hear a gunshot, but when they returned to the car, they announced that they just robbed and shot Greg Hersey. And they warned Gray to keep quiet, lest they do the same to him.

¶ 43    Sometime after the barbecue, Solomon-Bey talked to Gray about putting this in writing. Gray initially agreed but later begged off, claiming he was afraid. The principal source of his fear appeared to be Mims. Mims was in prison, but according to Solomon-Bey's affidavit, that did not assuage Gray's fear. So Solomon-Bey prepared his own (double hearsay) affidavit instead. Solomon-Bey confirmed that Gray was alive and well at the time of the hearing, and that he had

seen Gray at least ten times in the years since the barbecue.

¶ 44     Fourth, petitioner obtained an affidavit, dated June 13, 2012, from Jasper Johnson. (Not to be confused with Marita Johnson. References to "Johnson" are to Jasper the affiant, not Marita the witness.) Like Solomon-Bey, Johnson had known petitioner since they were children, having grown up together in Poplar Creek. And like Solomon-Bey, he shared a (purported) hearsay confession from Mims.

¶ 45     Johnson was once involved with a woman named Holly Lucy. They dated from 1992 to 1996, and they lived together, at Lucy's sister's house, from 1993 to 1994. One day in 1993 or 1994, Lucy seemed nervous or worried about something. Johnson asked what was wrong. Lucy said there was "something she had been holding in her heart, something that she witnessed." Lucy took Johnson down to the basement and showed him a bag of bloody clothes—a "short set suit" that was "white with different colors on it," with blood that "looked like splatter."

¶ 46     Lucy told Johnson that the clothes belonged to her ex-boyfriend, Raymond Mims. One "recent" day, Mims came by with "Major" and Payton. Mims changed into fresh clothes, left his bloodied clothes with Lucy, and said that he just robbed and shot Greg Hersey. Johnson didn't know if Mims asked Lucy to do anything with the clothes, but for her own part, Lucy was thinking about turning them over to the police. Johnson didn't think she ever did.

¶ 47      Johnson's affidavit clearly uses the name "Raymond Mims." At the hearing, he spoke of one "Raymond," and hemmed and hawed about the man's last name—claiming, at least at first, that he wasn't sure if the name "Mims" rang a bell. Truth be told, Lucy later married Mims, at least for a time. And Johnson knew it, as he eventually admitted on the witness stand.

¶ 48    In response to the court's question at the hearing, Johnson admitted that back in 1993 or 1994, he was (in the court's words) able to "connect the dots" between the bloody clothes and the criminal charges pending against his childhood friend, our petitioner. Yet he said nothing until his 2012 affidavit, in which he claimed to "[n]ow know[ ]" that petitioner was "falsely charged." Johnson testified that he was "much younger" back then, and "at that particular time" in his life, he "really didn't want to get involved."

¶ 49    After the hearing, the circuit court denied the petition in a written order, finding, in sum, that petitioner "failed to present new reliable evidence of such a conclusive character that would probably change the guilty verdicts."

¶ 50                                    ANALYSIS

¶ 51    Petitioner's lead argument is that the evidence supporting his actual-innocence claim was sufficient to warrant a new trial. And at a minimum, says petitioner, a new evidentiary hearing is warranted, because the circuit court committed various legal errors in its analysis.

¶ 52    When all is said and done, the dispositive point in this case is a simple one: petitioner's evidence was far from "conclusive." The circuit court's judgment was correct, and any alleged errors in the circuit court's application of the third-stage legal standards would be harmless. So we will cut to the chase.

¶ 53    Evidence is conclusive if, "considered along with the trial evidence, [it] would probably lead to a different result on re-trial." *People v. McCoy*, 2026 IL 131565, ¶ 54. The conclusive element of an actual-innocence claim frequently "involves credibility determinations that are uniquely appropriate for trial judges to make" after an evidentiary hearing. *People v. Coleman*,

2013 IL 1113307, ¶ 97. We thus review the circuit court's third-stage judgment, and any specific credibility determinations or other factual findings on which the judgment is based, for manifest error. *McCoy*, 2026 IL 131565, ¶ 51. An error is manifest if it is "clearly evident, plain, and indisputable." *Id.* ¶ 54 (quoting *Coleman*, 2013 IL 1113307, ¶ 98).

¶ 54    We note at the outset that the rules of evidence do not apply to post-conviction hearings. Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019); *People v. Robinson*, 2020 IL 123849, ¶ 78. So hearsay and affidavits may be admitted, as here, for the court's consideration. But at a third-stage post-conviction hearing, the court is free to assign whatever weight and reliability to that evidence it deems appropriate. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 118. And in determining whether the evidence is sufficiently conclusive that it would probably change the outcome at a retrial, "the court at the third stage must necessarily consider whether the new evidence would ultimately be admissible at a retrial." *Id.*

¶ 55    A brief recap of the trial evidence will help set the stage for our analysis. Petitioner was identified by three eyewitnesses. Granted, two were using cocaine and the third was a child. That said, the witnesses were well acquainted with petitioner—a daily visitor to Suzanne's apartment, who spent the better part of the day in question there, offering his barbering services and trading gaming systems for cocaine.

¶ 56    So notwithstanding his attempted disguise, in the form of a ski mask and hooded coat, Suzanne, Jason, and Marita recognized him—from his familiar voice, from the Michael Jordan sweatpants he wore that day, and from the distinctive haircut that was visible to Jason through a rip in the back of his hood or mask.

¶ 57    The shooting followed hot on the heels of an argument between petitioner and Hersey in which petitioner threatened—perhaps more seriously than Davis, the store clerk, realized—to kill Hersey. Immediately after the shooting, petitioner was found nearby with Daniels, or "Peewee," whom the witnesses also identified as one of the assailants. During that time, petitioner made an undeniably incriminating phone call to Suzanne's apartment.

¶ 58    That phone call was incriminating because petitioner already knew that Hersey was shot. He did not learn this from Suzanne, as he feigned to Officer McKinley. By all accounts, the very "first" thing he said was, "How is Greg?" Even if we grant that petitioner and Daniels saw the police gathering at Suzanne's from one or another window of Flanagan's apartment—a point about which Daniels seemingly lied, given Krull's testimony—that cannot explain how petitioner knew, right off the bat, that something happened to *Hersey* in particular. The only reasonable inference, from the trial evidence, is that petitioner knew to ask about Hersey because he was there when Hersey was shot.

¶ 59    Against this backdrop, we turn to petitioner's new evidence. First up is the DNA results: no blood or blood-like stains were indicated on petitioner's (or West's) clothes. Count this as a "non-match," which makes it "favorable" evidence, to some degree, for petitioner's claim. See, *e.g.*, *People v. Dodds*, 344 Ill. App. 3d 513, 520 (2003). So the probative value of this evidence is not exactly zero. But it also isn't much.

¶ 60    True, Hersey lost a lot of blood, at least by the time the paramedics arrived. And it was petitioner, according to the eyewitnesses, who shot him and then kicked him, to roll him over and take his wallet. But these facts do not warrant any strong expectation that Hersey's blood

would be found on petitioner's—or any assailant's—clothes.

¶ 61 For one, it is not unusual at all for a shooter to walk away without any of the victim's blood on his own clothes. That is especially true when, as here, the medical examiner found no evidence of a close-range shooting and testified, to the contrary, that Hersey died of a "distant gunshot wound." And recall that Hersey's gunshot wound was in his chest, underneath his shirt. Petitioner easily could have kicked Hersey—in the hip, the backside, or any number of places— to roll him over and steal his wallet, without getting a drop of Hersey's blood on his own clothes.

¶ 62 Thus, the absence of Hersey's blood on petitioner's clothes is, in some sense, a point in petitioner's favor, but its probative value is only marginal. For similar reasons, the lack of blood on West's clothes has even less probative value.

¶ 63 Attorney Bianucci's affidavit adds no probative value at all. Petitioner does not argue otherwise on appeal, so we will be brief. First, apart from being hearsay, Mary Hersey's reported statement, in which she claimed to know that petitioner "did not commit the murder," was entirely conclusory and lacked any demonstrated foundation in her personal knowledge. Second, the fact that Mary reportedly saw Suzanne, Jason, and Marita together in the emergency room is unremarkable. We have been given no reason to think that cross-examination on this topic would have been helpful to the defense. Attorney Bianucci made no effort to explain what he would have tried to establish. Nor is there any evidence of what the witnesses would have said.

¶ 64 That leaves Solomon-Bey and Johnson. After hearing their testimony, the circuit court found that their (double) hearsay accounts of Mims's alleged confessions were not reliable and credible and therefore deserved no weight. (Since the Bianucci affidavit drops out as irrelevant,

future references to the "hearsay evidence" refer to Solomon-Bey and Johnson.) We cannot say that these findings were manifestly wrong. A few key doubts about this evidence will suffice to make the point.

¶ 65    To start, (double) hearsay statements generally "lack the conventional indicia of reliability." *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973). The court was free to discount the evidence on this basis—unless petitioner demonstrated it was reliable despite being hearsay. *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 55. And again, petitioner's burden was not just to show that his witnesses were in some general sense believable; at the third stage, he had to establish more specifically that the evidence under consideration would have been admissible at a retrial as a hearsay exception. *Velasco*, 2018 IL App (1st) 161683, ¶ 118.

¶ 66    Reliability is generally the key element of this showing. That said, we would caution petitioners to be mindful of all that a particular hearsay exception might require them to establish. Here, petitioner relied on Mims's (purported) third-party confessions, so it is possible, in principle, that his evidence would be admissible as a statement against interest. Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011); see also *Chambers*, 410 U.S. 284; *People v. Tenney*, 205 Ill. 2d 411 (2002). For that to be the case, "corroborating circumstances" would have to "clearly indicate" the "trustworthiness" of the (purported) statements. Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011).

¶ 67    And because petitioner sought to introduce Mims's purported confessions through *double* hearsay—each witness (Solomon-Bey and Johnson) said that an out-of-court declarant (Gray and Lucy) said that Mims confessed—he had to establish that each layer of hearsay was trustworthy and admissible as a hearsay exception. Ill. R. Evid. 805 (eff. Jan. 1, 2011).

¶ 68    At each step, petitioner fell short of carrying this complex burden. Let's start with Mims himself. Unlike the original (albeit later recanted) confession in *Chambers*, 410 U.S. at 287-88, for example, Mims's purported statements in Gray's car and Lucy's basement lack the indicia of reliability of a "sworn confession" that was "transcribed, signed, and witnessed" in defense counsel's office. Apart from the fact that Mims's purported confessions to Gray and Lucy are facially consistent (a fact that proves little, for reasons we will explain below), petitioner does not point to any corroborating circumstances to demonstrate their trustworthiness. And all of this assumes that Mims actually confessed to begin with. There is no objectively reliable proof that he did, as there was in *Chambers*. That assumption depends first on the credibility of Gray and Lucy, and then once more on the credibility of Solomon-Bey and Johnson.

¶ 69    The circuit court found it significant that Gray and Lucy, who (supposedly) claimed to witness Mims's confessions, never came forward to testify under oath, and that petitioner did not offer any compelling explanations for their reticence. Petitioner takes the circuit court to task for citing section 122-2 of the Post-Conviction Hearing Act in this context. 725 ILCS 5/122-2 (West 2024) ("The petition shall have attached thereto affidavits, records, or other evidence *** or shall state why the same are not attached."). We agree with petitioner that the citation is misplaced at a third-stage hearing, as section 122-2 sets forth the corroboration requirements for a petition at the initial pleading stage. See *People v. Hodges*, 234 Ill. 2d 1, 10 (2009).

¶ 70    Still, the circuit court's guiding concern was not misplaced at all. As one element of his overall burden, petitioner needed to demonstrate that Gray and Lucy were credible, which is to say, that their reports of Mims's alleged confessions were trustworthy. The usual method is to

put the declarants on the stand and subject them to cross-examination, but Gray and Lucy were apparently unwilling to testify under oath. Their reports could fairly be deemed incredible for this reason alone—unless, to the circuit court's point, petitioner could provide a reason for their absence that did not call their credibility into doubt. To the extent that petitioner failed to do so, he failed to demonstrate the reliability of his hearsay evidence.

¶ 71    And to reprise an earlier theme, all of this assumes that Gray and Lucy actually heard and reported Mims's alleged confessions to begin with. The only evidence that they did came from Solomon-Bey and Johnson, whose reported double hearsay testimony stood uncorroborated in the (unexplained) absence of the declarants they claimed to parrot. On top of those doubts, Solomon-Bey and Johnson were longtime friends of petitioner, who had known him for over 30 years, since they were children. In the circuit court's view, they were biased in petitioner's favor.

¶ 72    That point seems especially obvious in the case of Solomon-Bey. Even before Gray gave him concrete information regarding Mims's confession and petitioner's innocence, Solomon-Bey publicly displayed his commitment to petitioner's cause: it was Solomon-Bey's "Jerome Vonner wrongfully convicted" t-shirt that induced Gray to share what he supposedly knew. This is not at all surprising; a lifelong friend is surely a top candidate for taking up an incarcerated petitioner's cause. But for precisely this reason, a lifelong friend is hardly an ideal vehicle for hearsay that comes without much or any objective corroboration.

¶ 73    Look at it this way: neither witness who supposedly heard Mims confess was willing to testify to this under oath, but two of petitioner's longtime friends were willing to step into the breach. The circuit court had every right to be skeptical of their uncorroborated double hearsay.

¶ 74    And Johnson gave the circuit court further reasons to be skeptical. For one, Mims went on to marry Lucy, the woman Johnson was romantically involved with, and living with, when Mims supposedly confessed to her. Thus, in the process of helping his old friend, Johnson also pinned a murder on a onetime "romantic rival," as the circuit court put it. Add to that Johnson's yearslong delay in coming forward, despite admitting at the hearing that he quickly connected what Lucy supposedly told (and showed) him to the murder charges pending against his friend. The circuit court found it "incredible" that Johnson "supposedly had information that another person had committed a capital murder for which his childhood friend stood accused, yet did nothing" for all those years.

¶ 75    But enough grounds for skepticism, at least for the moment. Turning to the other side of the ledger, what does petitioner have to say in defense of his evidence and its trustworthiness? A key refrain in his argument is that both lines of double hearsay point directly to Mims, acting with the same two confederates, "Major" and Payton.

¶ 76    Petitioner touts this "consistency on key details" as a virtue of his hearsay evidence. See *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 41. Consistent accounts from multiple witnesses may of course lend each other credence. For example, in addition to his sworn confession, the confessing third party in *Chambers*, 410 U.S. at 292-93, also confessed to three different friends on separate occasions. Those consistent hearsay accounts bolstered each other—but in no small part because they all shared the same corroboration provided by the original sworn confession witnessed in counsel's office. See *id.* It bears repetition that Mims's purported statements lack any such corroboration. Nor is petitioner's hearsay evidence particularly rich in "key details." In

fact, it is rather sparse, offering little detail beyond the identities of three supposed confederates.

¶ 77    But most fundamentally, consistent accounts are mutually corroborating only if they are independent sources of information. And while the circuit court did not put the point in exactly these terms, it is clear enough that the court had its doubts about the origin of Solomon-Bey's and Johnson's affidavits.

¶ 78    The circuit court's evident doubts on this score come through at two points. First, the court found that Solomon-Bey's testimony, in which he claimed to prepare his own affidavit, "did not have the ring of truth," given that it "contained the same typeset and format" as Johnson's affidavit. Even more striking, to our eye, are certain commonalities of style—shared wordings at various junctures, even shared misspellings of the same words, such as "notaray" for "notary"—that are unlikely to be happenstance. Second, following up on its suspicions, the circuit court asked Johnson some simple questions about the preparation of his affidavit and was struck by the "vacillat[ion]" and "confus[ion]" that ensued. Johnson first insisted that he wrote his affidavit himself, by hand, but later claimed that it was typed and presented to him by a team of "investigators or something."

¶ 79    In the trial court's view, petitioner's key witnesses could not provide credible, consistent accounts of where their affidavits came from. Indeed, it is hard to believe that two affidavits that look and sound this much alike came from two independent affiants. And it is equally hard to believe that these two affidavits, with their unmistakably *pro se* style, are the common work product of a legal office acting on petitioner's behalf. Where, then, might they have originated?

¶ 80    The question suggests its own answer. The circuit court did not go so far as to accuse

petitioner of fabricating these affidavits for two of his old friends to sign. And neither will we. That said, it was petitioner's burden to establish that the hearsay evidence he seeks to introduce through Solomon-Bey and Johnson is trustworthy. And the inability of his witnesses to provide convincing assurances of the provenance and authenticity of their affidavits only adds to the long and ever-growing list of ways in which petitioner has failed to carry that burden.

¶ 81    There is more that could be said on various topics, including the circuit court's findings that Solomon-Bey and Johnson were impeached on any number of issues; petitioner's arguments that those perceived impeachments were minor and inconsequential; his arguments that the lack of charges against Daniels and West, considered alongside the hearsay finger-pointing at two different confederates, strongly undermines the eyewitness identifications; and his attempts to show that considering the hearsay and DNA evidence side by side yields some measure of mutual corroboration. All of these topics have been considered, and none, in our view, will move the needle from where it has firmly landed: the circuit court did not manifestly err in finding that petitioner's hearsay evidence was not trustworthy enough to be given any weight.

¶ 82    Which means that petitioner's claim ultimately rests on the ever-so-slight probative value of the DNA evidence alone. That evidence does not impugn the identifications of petitioner as the shooter or cast any new light on his highly incriminating phone call to Suzanne. It is far from "conclusive" and therefore does not warrant a new trial.

¶ 83                                CONCLUSION

¶ 84    For these reasons, the judgment of the circuit court is affirmed.

¶ 85    Affirmed.